The SHEPHERD PARK CITIZENS ASSOCIATION, et al., Appellants,

v.

GENERAL CINEMA BEVERAGES OF WASHINGTON, D.C., INC., et al., Appellees.

No. 90–245.

District of Columbia Court of Appeals.

Argued Oct. 23, 1990.
Decided Dec. 19, 1990.

Leonard S. Goodman, Washington, D.C., for appellants.

William J. Guzick and Lee H. Simowitz, with whom C. Benjamin Crisman, Jr., Gary A. MacDonald, Gerald A. Connell, and Peter B. Kenney, Jr., Washington, D.C., were on the brief, for appellees.

Herbert O. Reid, Sr., Corp. Counsel, with whom Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., filed a statement in lieu of brief on behalf of the District of Columbia.

Before FERREN, BELSON, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

In this appeal we reject challenges to an order of the trial court approving a settlement of antitrust litigation between the District of Columbia as *parens patriae* and two soft drink bottling companies.

## I.

On September 9, 1988, the District of Columbia (the District) as *parens patriae* filed a complaint alleging that General Cinema Beverages of Washington, D.C., Inc. (GC–Washington) and the Mid–Atlantic Coca–Cola Bottling Company, Inc. (Mid–Atlantic) had agreed to fix the prices of soft drinks in the metropolitan Washington, D.C. area in violation of the District of Columbia antitrust act, D.C.Code §§ 28–4501 to –4518 (1981). The District brought suit on behalf of natural persons who, while residing in the District of Columbia, had purchased soft drinks indirectly from defendants through retailers and other intermediaries between September 30, 1984 and September 30, 1986.[1]

The District filed the complaint after conducting what the trial court found to be a "thorough investigation" of the case using in part the civil investigative demand procedures of D.C.Code § 28–4505 (1981). Also, the District's investigation supplemented a grand jury investigation previously instituted by the United States Department of Justice which had resulted in a plea of guilty by GC–Washington on October 15, 1986, to conspiracy to fix the price of certain soft drinks between October 1984 and August 31, 1985; and a plea of guilty more limited in scope by Mid–Atlantic on October 14, 1987.

Following the filing of the complaint by the District, the parties entered into settlement negotiations which resulted in an agreement in principle on October 14, 1988,

---

1. Meanwhile, in complaints filed in the United States District Court for the District of Columbia, several "direct purchasers," *i.e.*, retailers of soft drinks in the Washington, D.C. metropolitan area, had brought a class action against the same defendants for violation of the federal antitrust laws. Those claims resulted in a settlement of approximately $4,500,000 adopted by the District Court in May of 1989.

under which the defendants would pay $180,000 immediately to settle the *parens patriae* claims. A final settlement was filed with the Superior Court on December 2, 1988, after which the District moved the court for preliminary approval of the agreement.[2] On December 21 the trial court granted the motion for preliminary approval and directed that notices regarding the settlement be published in *The Washington Post.*

Only a few responses were received, chief of which was an objection by appellant Leonard Goodman on behalf of himself, the Shepherd Park Citizens Association, and certain other District of Columbia citizens (hereafter appellants). After full briefing on the reasonableness of the settlement, the trial court held a hearing on March 24, 1989, following which it granted final approval of the settlement. Appellants moved for reconsideration on April 3 and on February 6, 1990, the court denied the motion in a Memorandum of Decision and Order.

## II.

This court has not addressed the standard of review of a trial court's approval of a settlement agreement under the local *parens patriae* statute or in the analogous context of class actions. We ally ourselves with the United States Court of Appeals for the District of Columbia Circuit, however, in "stress[ing] the limited scope of our review of such orders."

> Appellants must show that the [trial] [c]ourt abused its discretion: this generally requires a showing either that the agreement in question was so manifestly unfair as to preclude judicial approval, or that the court did not have sufficient facts before it to make an informed judgment.

*Weil v. Markowitz,* 264 U.S.App.D.C. 381, 386–87, 829 F.2d 166, 171–72 (1987) (footnote omitted). Moreover,

> [g]reat weight is accorded his [the trial judge's] views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.

*Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 34 (3d Cir.1971); *see also City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 454–55 (2d Cir.1974).

At the outset, we are satisfied that the trial court had sufficient facts before it to make an informed judgment. *Weil, supra.* In requesting court approval, the District filed a lengthy submission setting forth the course of the investigation and the negotiations leading to the settlement, as well as its perception of the litigation risks and other considerations underlying its decision to settle for the amount proposed. Appellants, represented vigorously by Mr. Goodman, responded in great detail and both the District and the private appellees followed with replies again discussing each of the criteria normally governing the trial court's decision to approve a settlement or not; see discussion, *infra.* The trial court reflected upon the matter three times—on the motion for preliminary approval, the motion for final approval, and the motion for reconsideration—thus leaving no doubt that her decision was based upon familiarity with the facts and strategic considerations underlying the proposed settlement.

This court also has not considered the legal standards which the trial court must use in determining whether to approve a proposed antitrust settlement. Consequently, the trial court was correct in looking to the standards applied in cases aris-

---

**2.** The parties are in accord that the District of Columbia antitrust act is patterned after the federal *parens patriae* statute, the Hart–Scott–Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 15c. Whereas that law makes specific provision for court approval of any proposed dismissal or compromise of the action, however, the District's antitrust statute has no such provision. Nevertheless, by analogy to the fed-

eral statute and the requirements for a class action, *see* Super.Ct.Civ.R. 23(e) (1990), the District proposed that the parties seek court approval of the settlement, and appellees consented. Since no one has opposed recourse to the court for approval throughout these proceedings, we need not—and do not—decide that judicial approval is necessary under the District's antitrust statute.

ing under the federal *parens patriae* statute, see note 2, *supra,* as well as class action suits.[3] The overarching consideration is whether the settlement is "fair, reasonable and adequate." *In re Mid–Atlantic Toyota, supra* note 3, 605 F.Supp. at 442 (quoting MANUAL ON COMPLEX LITIGATION § 1.46 at 56–57 (5th ed. 1982)). Included in this standard, as the trial court aptly summarized the matter, is "consideration of ... [the] extent of investigation, proof problems, strength of defenses, costs of litigation, good faith, possible collusion, the experience of counsel and extent of opposition to the settlement." *See In re Minolta Camera Prods., supra* note 3, 668 F.Supp. at 459; *Grinnell Corp., supra,* 495 F.2d at 463. As the following discussion reveals, we find no abuse of discretion in the trial court's determination, after applying these factors, that the settlement is fair, reasonable, and adequate.

■ *First,* the court considered the extent of the investigation carried out by the District before agreeing to the settlement. In their brief appellants emphasize that the District settled with the defendants little more than a month after the complaint was filed and before its interrogatories and document requests were even answered. However, in requesting approval of the settlement, the District represented that it had obtained "interrogatory answers and thousands of pages of documents from the

bottlers in response to civil investigative demands" made in 1986 and 1987, before the complaint was filed. As the trial court found:

> Detailed interrogatories were propounded during the first six months of 1987. There were informal exchanges of information. The District and its economic consulting firm met with defendants to conduct discovery nine times during 1987. In addition, the District had access to all documents obtained by the United States Department of Justice in its investigation of the alleged soft drink price-fixing conspiracy. Although the complaint was not filed until September 1988, the case was ripe for resolution and settlement was not reached in haste.

We find no basis in the record for disturbing this conclusion.[4]

■ *Second,* concerning the risks and costs of litigation, the trial court noted first that at the time the proposed settlement was reached the constitutionality of state antitrust statutes such as the District's was somewhat in doubt in view of a federal appellate decision, *In re Cement and Concrete Antitrust Litigation,* 817 F.2d 1435 (9th Cir.1987), *rev'd sub nom. California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), which held such statutes permitting indirect purchaser (or consumer) claims against anti-

---

**3.** *See In re Minolta Camera Prods. Antitrust Litigation,* 668 F.Supp. 456 (D.Md.1987); *In re Mid-Atlantic Toyota Antitrust Litigation,* 605 F.Supp. 440, 442 (D.Md.1984); *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 740 (S.D.N.Y. 1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

**4.** In disputing it, appellants rely substantially on an affidavit by Leonard Goodman in the record below reporting a statement to him by an Assistant Corporation Counsel that the documents received from the defendants informally had been "mostly transactional" and "not very helpful." Whatever the former phrase may mean, the trial judge did not err in giving little weight to this affidavit in view of the District's contrary representations in court that the settlement had been reached based on adequate information and a reasoned evaluation of the District's case. Nor did the District's failure to employ use immunity, *see* D.C.Code § 28–4505(g)(7), other than for a single witness cast doubt on the settlement in view of the pre-complaint inter-

views the District had held with some company executives and its access to the records of the Department of Justice's investigation.

Appellants further argue that a bill of particulars submitted by federal prosecutors in the criminal antitrust litigation involving Edward L. Wynns, a former vice-president of GC–Washington, should have made District investigators realize that the conspiracy—and hence the damages to District of Columbia consumers—extended over a period of five years and not just the two years alleged in the District's *parens patriae* complaint. Wynns, however, eventually pleaded guilty to one count of perjury, not conspiracy, and given the fact that the United States government accepted pleas by the corporate defendants to conspiracies covering only eleven months, we will not second-guess the trial judge's conclusion that any evidence the District could hope to obtain of a five-year conspiracy was "speculative."

trust violators invalid under the federal Supremacy Clause. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (barring claims by indirect purchasers for damages under federal antitrust laws). Appellants argue that, whatever might have been the District's uncertainty about the health of its statute at the time settlement was reached (they note that the Supreme Court had granted certiorari in the *In re Cement* case before the settlement was forged), this concern vanished as a basis for the trial court's approval of the settlement when the Supreme Court reversed the Ninth Circuit in *California v. ARC America Corp., supra.* Appellants stress that this occurred while their timely motion for reconsideration of the final approval order was pending and while the court thus retained full authority to reject the settlement in the public interest. We think, however, that appellants focus on the wrong point in time in challenging the District's assessment of this particular litigation risk.

In *Dawson v. Pastrick,* 600 F.2d 70 (7th Cir.1979), the court of appeals considered an argument that a Supreme Court decision, rendered on the very day the district court had given its approval to a consent decree, invalidated a portion of an award under the decree. In rejecting the argument, the court stated:

> To allow post-approval changes or clarifications in the law to upset a settlement would be contrary to the established policy of encouraging settlements and frequently would allow a party to back out of a bargained-for position after agree-

ment has been reached. At least in the absence of unusual hardship to the objecting party, we decline to permit subsequent events to defeat otherwise reasonable settlements.

*Id.* at 76.[5] This reasoning is sound. It would be a positive disincentive to settlements if litigants knew an accord were vulnerable to ordinary changes in the law occurring after the agreement—indeed, as here, after final court approval but before exhaustion of post-judgment remedies (perhaps including even appeal). As in *In re Master Key, supra* note 5, the pending petition for certiorari in the *ARC America Corp.* case "was a question mark for all parties," a contingency they "were free to compromise by way of settlement"; and absent some patent injustice of which there is no evidence here, we shall give effect to the parties' evaluation of the risk at the time it was made.

Furthermore, whatever the constitutional validity of the District of Columbia antitrust statute at the time, the District could properly take into account that, as the trial court stated, "[a]ntitrust litigation ... in general [is] complex, costly and time consuming," and that "[t]here was no evidence that this case was any different." On the contrary, the District was aware that this was a "pass on" case in which the government would have the burden of establishing that the retailers "passed on" the illegally fixed prices to District of Columbia consumers as indirect purchasers. The difficulty and costliness of this proof was at the heart of the Supreme Court's decision in *Illinois Brick, supra; see also Kansas*

---

**5.** To like effect, and factually even closer on point, is in *In re Master Key Antitrust Litigation,* 76 F.R.D. 460 (D.Conn.1977), *aff'd mem.,* 580 F.2d 1045 (2d Cir.1978). There the defendants settled with plaintiffs representing a class of indirect purchasers shortly before the Supreme Court ruled in *Illinois Brick* that indirect purchasers have no claim for damages under federal antitrust law. The defendants then moved to vacate the judgment entered on the basis of their settlement, and the District Court denied the motion. The court made clear that its ruling would apply equally to plaintiffs or defendants who might seek similar relief from a settlement based on a subsequent change in the law.

> The pending petition for certiorari in *Illinois Brick* was a question mark for all parties. These were all contingencies the litigants were free to compromise by way of settlement. But for the legal risks of their claims, plaintiffs might well have demanded a far greater sum of money before consenting to the dismissal of the actions. If *Illinois Brick* had been decided in favor of the indirect purchasers, plaintiffs could not complain that they settled too cheaply. Defendants are in a similar position. Both sides were at risk; they got exactly what they bargained for.

76 F.R.D. at 464–65 (footnotes omitted).

*v. Utilicorp. United, Inc.,* — U.S. —, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). Appellants argue that, despite the complexities of proof in "pass on" cases generally, they are illusory in the present context because of the conceded monopoly position of the defendants in the local soft drink market. Consequently, the District could litigate the case under a so-called "price umbrella" theory requiring it to show only the aggregate quantity of the soft drinks purchased by consumers at affected prices.[6] Suffice it to say—by a court such as ours professing little acquaintance with the arcana of federal antitrust theory—that at least one federal court of appeals has disapproved the sort of theory appellants proffer as entailing complexities of proof that "parallel" those the Supreme Court found decisive in *Illinois Brick.* See *Mid–West Paper Prods. Co. v. Continental Group, Inc.,* 596 F.2d 573, 580–87 (3d Cir.1979). The District thus had legitimate reason to be concerned with the difficulty of proving that the retailers injured by the defendants had passed on the price increases to consumers, and to what extent.[7]

■ *Third,* the trial court examined the District's estimate of actual damages for District of Columbia residents as indirect purchasers and found that the proposed settlement bore a reasonable relation to it. Appellants argue that the District's estimate of damages at between $343,907 and $480,000 was grossly inadequate when compared to the damages embodied in the settlement of approximately $4.5 million

approved by the United States District Court for claims brought by direct purchasers against General Cinema and Mid–Atlantic, see note 1, *supra.* We reject appellants' various challenges to the methodology by which the District reached the estimates approved by the trial court.[8] And we agree with Judge Bacon that comparison of the federal settlement with the proposed settlement is not a measure of the adequacy or fairness of the latter. The District represented, and appellants do not dispute, that as much as 30% of the $4.5 million settlement in District Court was set aside for attorney's fees in that suit brought by private litigants. Moreover, the suit was brought by direct purchasers in the combined metropolitan Washington, D.C. area, of which the District's population is conceded to be 20% of the aggregate population. Accordingly, the District's percentage (20%) of the net damages reflected in the federal settlement (approximately $3.2 million), reduced by the risk factor previously discussed, demonstrates that the $180,000 figure the parties proposed was not so unreasonable as to require judicial disapproval. We find no abuse of discretion in the trial court's acceptance of that sum as adequate and fair.[9]

### III.

■ The parties to the settlement agreed that the $180,000 would be deemed a civil penalty and deposited in the District of Columbia Antitrust Fund established by D.C.Code § 28–4516(a). That section pro-

---

**6.** See *In re Uranium Antitrust Litigation,* 556 F.Supp. 806, 807 (N.D.Ill.1983).

**7.** In addition, the trial court noted that because the pleas of guilty taken in the criminal antitrust actions covered a conspiracy of only eleven months, the District would have to prove about one-half of its claims—based upon an alleged two-year conspiracy—without the evidentiary benefit of those pleas.

**8.** We are not persuaded, for example, that the District's estimate mistook a one-year damage figure computed in the District Court litigation for a two-year figure, thus halving a portion of the actual damages.

**9.** Nor is there any reason to disturb the court's findings with respect to the remaining factors

courts have considered in reviewing proposed settlements. The court found that

> [t]he record on March 24, 1989 permitted a conclusion that the settlement was reached as a result of good-faith bargaining at arm's length between experienced counsel. Although the antitrust statute is of recent origin, there was no suggestion that counsel for the District of Columbia was not qualified to handle substantial litigation. Further, there was no suggestion of collusion. Indeed, the governmental nature of the case obviated any concern that counsel may have sought settlement to insure a fee. The absence of significant opposition from any source other than [appellants] also mitigated [*sic;* militated] in favor of approving the settlement.

vides that the Fund shall consist, in part, of "such sums as may be received by the District of Columbia pursuant to a settlement of an antitrust action." Appellants argue that the monies "could as readily" have been deemed a recovery of costs and attorney's fees, and insist that "[i]t is unprecedented that 100% of a settlement fund should be paid for litigation costs." We find no merit in this argument. While a portion of the $180,000 undoubtedly served to compensate the District for its litigation costs, the principal reason why the parties proposed—and the court approved—deposit of the penalty in the antitrust fund was the sheer impracticality of providing individual compensation under D.C.Code § 28–4507(b)(2)(B).[10] As the District argued, very few consumers could be expected to have kept receipts or other proof of purchase for soft drinks purchased four to five years earlier, and the amount estimated to be due each affected consumer was about forty-five cents. Thus the trial court sensibly concluded that the costs of distributing the recovery to affected purchasers would greatly exceed any individual benefit to them.

Appellants urge that the court, in approving the deposit, failed to consider the alternative of using the monies for "a general public purpose," such as to improve nutritional education in the city schools, rather than "converting them to government revenue." The distinction is illusory here. Section 28–4516(b) provides that the antitrust fund "shall be available for use by the Corporation Counsel for the payment of costs, expenses, and charges incurred in and reasonably related to the investigation, preparation, institution, and maintenance of antitrust actions under the District of Columbia Antitrust Act and Federal antitrust laws." It cannot reasonably be argued that setting aside funds for such investigation and pursuit of antitrust actions in the future does not serve an important "general public purpose." The unfeasibility of distribution under § 28–4507(b)(2)(B) was ample justification for placing the money in a fund available for other antitrust actions in the public interest.

For the foregoing reasons, the orders approving the settlement agreement and denying appellants' request for reconsideration are

*Affirmed.*

---

10. Section 28–4507(b)(2)(B) provides that money recovered in an antitrust action and deemed a civil penalty shall be deposited with the District of Columbia, subject to the requirement "that any distribution procedures adopted shall first afford each person a reasonable opportunity to secure each such person's appropriate portion of the net monetary relief."