96 F.3d 44
 1996-2 Trade Cases P 71,558
 STATE OF NEW YORK, by Attorney General Dennis C. VACCO;
State of Alabama, by Attorney General Jeff Sessions; State
of Alaska, by Attorney General Bruce Botelho; State of
Arizona, by Attorney General Grant Woods; State of
Arkansas, by Attorney General Winston Bryant; State of
California, by Attorney General Daniel E. Lungren; State of
Colorado, by Attorney General Gale A. Norton; State of
Connecticut, by Attorney General Richard Blumenthal; State
of Delaware, by Attorney General M. Jane Brady; District of
Columbia, by Corporation Counsel Garland Pinkston; State of
Florida, by Attorney General Robert A. Butterworth; State
of Georgia, by Attorney General Michael J. Bowers; State of
Hawaii, by Attorney General Margery S. Bronster; State of
Idaho, by Attorney General Alan G. Lance; State of
Illinois, by Attorney General Jim Ryan; State of Indiana,
by Attorney General Pamela Carter; State of Iowa, by
Attorney General Thomas J. Miller; State of Kansas, by
Attorney General Carla J. Stovall; Commonwealth of
Kentucky, by Attorney General Chris Gorman; State of
Louisiana, by Attorney General Richard P. Ieyoub; State of
Maine, by Attorney General Andrew Ketterer; State of
Maryland, by Attorney General J. Joseph Curran, Jr.;
Commonwealth of Massachusetts, by Attorney General Scott
Harshbarger; State of Michigan, by Attorney General Frank
J. Kelly; State of Minnesota, by Attorney General Hubert H.
Humphrey, III; State of Mississippi, by Attorney General
Mike Moore; State of Missouri, by Attorney General Jeremiah
Nixon; State of Montana, by Attorney General Joseph M.
Mazurek; State of Nebraska, by Attorney General Don
Stenberg; State of Nevada, by Attorney General Frankie Sue
Del Papa; State of New Hampshire, by Attorney General
Jeffrey R. Howard; State of New Jersey, by Attorney General
Deborah T. Portiz; State of New Mexico, by Attorney General
Tom Udall; State of North Carolina, by Attorney General
Michael F. Easley; State of North Dakota, by Attorney
General Heida Heitkamp; State of Ohio, by Attorney General
Betty D. Montgomery; State of Oklahoma, by Attorney General
Drew Edmondson; State of Oregon, by Attorney General
Theodore R. Kulongski; Commonwealth of Pennsylvania, by
Attorney General Ernest D. Preate, Jr.; Commonwealth of
Puerto Rico, by Attorney General Pedro D. Pierluisi; State
of Rhode Island, by Attorney General Jeffrey B. Pine; State
of South Carolina, by Attorney General Charles Molony
Condon; State of South Dakota, by Attorney General Mark W.
Barnett; State of Tennessee, by Attorney General Patricia
J. Cottrell; State of Texas, by Attorney General Dan
Morales; State of Utah, by Attorney General Jan Graham;
State of Vermont, by Attorney General Jeffrey L. Amestoy;
Commonwealth of Virginia, by Attorney General James S.
Gilmore, III; State of Washington, by Attorney General
Christine O. Gregoire; State of West Virginia, by Attorney
General Darrell V. McGraw, Jr.; State of Wisconsin, by
Attorney General James E. Doyle, Jr.; State of Wyoming, by
Attorney General William U. Hill; U.S. Virgin Islands, by
Attorney General Julio Brady, Plaintiffs-Appellees,
Sylvia Donnenfeld and Eduardo A. Lopez, Appellants,
v.
REEBOK INTERNATIONAL LTD., the Rockport Company, Inc. and
John Does 1-500, Defendants-Appellees.
 No. 1478, Docket 95-9154.
 United States Court of Appeals,
Second Circuit.
 Argued April 24, 1996.
Decided Sept. 16, 1996.
 
 Pamela Jones Harbour, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General of the State of New York, Victoria A. Graffeo, Solicitor General, John H. Carley, Deputy Attorney General, Stephen D. Houck, Linda J. Gargiulo, Robert L. Hubbard, John A. Ioannou, Assistant Attorneys General, New York City, of counsel), for Plaintiffs-Appellees.
 David A. Martland, Boston, MA (Hutchins, Wheeler & Dittmar, Boston, MA, Steven E. Greenbaum, Berlack, Israels & Liberman, New York City, Michael Nachwalter, Kenny, Nachwalter, Miami, FL, of counsel), for Defendants-Appellees.
 Thomas A. Paigo, Hialeah, FL (Carlos Lidsky, Hialeah, FL, of counsel), for Appellants.
 Before: VAN GRAAFEILAND, MAHONEY and WALKER, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 This appeal challenges the district court's approval of the settlement of a parens patriae suit brought pursuant to 15 U.S.C. § 15c by the fifty states, the District of Columbia, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands (collectively the "States") against Reebok International Ltd. and its wholly owned subsidiary, the Rockport Company, as well as unidentified "John Does" (collectively "Reebok") alleging violations of federal and state antitrust laws. See 903 F.Supp. 532 (S.D.N.Y.1995). The participants in the settlement have not appealed; Sylvia Donnenfeld and Eduardo Lopez, who claim to be victims of the alleged violations, have. The States and Reebok challenge the appeal on two grounds: (1) that Donnenfeld and Lopez do not have standing to appeal; and (2) that, assuming they have standing, the appeal is without merit. We agree on both grounds.
 
 
 2
 On May 4, 1995, the States filed a complaint in the United States District Court for the Southern District of New York. The complaint alleged that Reebok had implemented a price-fixing scheme to maintain artificially the price of Reebok and Rockport brand footwear from January 1990 through December 1994 in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 4, 4C, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, & 26, as well as state antitrust laws. Acting through their attorneys general, the States sued both in their sovereign capacities and as parens patriae on behalf of their natural residents who had purchased Reebok or Rockport footwear during the specified period. Parens patriae suits of this nature were created by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. §§ 15c-15h, to circumvent the often onerous requirements of Rule 23 of the Federal Rules of Civil Procedure. See H.R.Rep. No. 499, 94th Cong., 2d Sess. 6-7 (1975), reprinted in 1976 U.S.C.C.A.N. 2572, 2576. Congress empowered state attorneys general to investigate and prosecute antitrust abuses on behalf of consumers stymied by Rule 23's certification and notification hurdles. Id.
 
 
 3
 Coincident with the filing of the complaint, the States submitted a proposed Settlement Agreement for the district court's approval pursuant to 15 U.S.C. § 15c(c). Although Reebok did not concede liability in the Settlement Agreement, it agreed to pay $8 million into a Settlement Account to be distributed on a pro rata basis to the States to be used either by the States or by designated not-for-profit organizations to support recreational activities. In addition, Reebok agreed to pay $1.5 million in administrative expenses, which included the cost of notifying consumers of the terms of the Settlement Agreement. Finally, Reebok agreed to remind its retailers that they are free to set prices at any level they choose, and to refrain from entering into any agreement to fix prices for five years.
 
 
 4
 The Settlement Agreement was submitted to the district court (Koeltl, J.) upon stipulation of counsel and without a formal hearing. On June 5, 1995, the district court preliminarily approved the Agreement and ordered the parties to proceed with newspaper notice of the proposed settlement. The notice, which was published during the period July 9-14, 1995, summarized the settlement terms and stated that all objections and/or opt-outs had to be filed by September 8, 1995. See 903 F.Supp. at 533. It was published nationwide in 808 newspapers at a cost of $875,571.35. Id. at 533 n. 1. The State of Florida was blanketed, the notice appearing in 34 newspapers in 34 different locales. Nevertheless, the cutoff date for objections and opt-outs came and went, and nothing was heard from either Donnenfeld or Lopez, both Florida residents.
 
 
 5
 In addition to summarizing the terms of the proposed settlement, the published notice provided that a hearing would be held on October 13, 1995 for the purpose of determining whether the proposed settlement was fair, reasonable and adequate and should be approved by the court. On that day, two Florida lawyers, Carlos Lidsky and Thomas Paigo, who apparently are associated in practice, appeared in Judge Koeltl's courtroom and asked to be heard. Neither requested intervention. Lidsky spoke first. He said that he was appearing on behalf of "some plaintiffs in two lawsuits filed in the Southern District of Florida that are presently pending." The "some plaintiffs" were not identified, and no affidavit or other document executed by them was presented to explain their failure to make timely objection. Instead, the proposed excuse was presented by Lidsky himself as follows:
 
 
 6
 Your Honor, we respectfully submit that prior to the day before yesterday, when we were faxed the settlement documents and the notice of this hearing, prior to the day before yesterday, at that time we had no knowledge of this settlement. We had no knowledge of these proceedings. We had not heard about it. We had not read about it.
 
 
 7
 We regularly read periodicals of national circulation. We read the Wall Street Journal and the New York Times. We read the Miami [Herald] and Business Review in Florida. At no time did we ever read or otherwise hear about this settlement, and we would request that your Honor hear us on our objections because we do think we have some valid points to raise.
 
 
 8
 In making this presentation, Lidsky obviously was referring to himself and his associate, Paigo, neither of whom was an intended recipient of the notice of settlement. We are unwilling to accept it as proof that neither Donnenfeld nor Lopez, who turned out to be the "some plaintiffs" referred to by Lidsky, had notice of the proposed settlement.
 
 
 9
 Indeed, counsel for the States are not convinced that the attorneys themselves were without notice. They point to the fact that, in addition to the prescribed newspaper notices, at least 44 articles about the settlement appeared in other publications between May 4, 1995 and September 30, 1995. Moreover, they deem it more than coincidence that a strong similarity exists between the allegations in the States' complaint, which was filed and thus made public on May 4, and those in appellants' complaints that were filed on September 28, 1995. Finally, Lidsky's description of the Florida litigation as "pending" means no more than that the complaints were filed. We pass no judgment on the merits of States' counsels' reservations.
 
 
 10
 When attorney Lidsky asked to be heard, States' counsel promptly raised the question of his standing because of the lack of filed objections. The district court responded to this objection as follows:
 
 
 11
 I appreciate the arguments of lack of standing. And I have no question on the papers before me, which go through the notice that was provided in accordance with my prior order and the extensive published notice throughout the 50 states and other political entities which are plaintiffs in this case and the nature of the notice which I approved and the extensive publication and, indeed, the high cost of the notice, which I believe was in excess of $800,000, to place notice in all of the newspapers so that there would be notice in the best, most reasonable, practical way that it could be made. So I realize the objection with respect to standing.
 
 
 12
 I still have to make a determination, as the parties concede, that the settlement here is fair, reasonable and adequate. And so, if Mr. Lidsky or Mr. Paigo have anything to bring to my attention at this hearing that I ought to consider with respect to the final approval of the settlement, I will listen to that, because I have to make a determination within respect to the fairness and the reasonableness of and adequacy of the settlement. So I will listen.
 
 
 13
 This, we hold, was not a grant of standing. For standing to exist, a would-be litigant must have sustained a palpable injury that is likely to be redressed by a favorable decision. See American Postal Workers Union v. Frank, 968 F.2d 1373, 1374 (1st Cir.1992). We liken it instead to an indication of the court's willingness to receive the comments of Lidsky and Paigo in the capacity of amici curiae, whose comments would not excuse their clients' failure to make timely objection. See United States v. LTV Corp., 746 F.2d 51, 53 (D.C.Cir.1984). It is most unlikely, in view of the relief that Lidsky and Paigo were seeking, that the district court would waive the requirement of timely objection by them without regard to the rights of numerous others who might be adversely affected thereby. As the case comes to this Court, Donnenfeld and Lopez have not been made parties to the litigation, and we must determine whether they have standing to appeal the district court's approval of the settlement.
 
 
 14
 Because there is a dearth of authority on the issue of unnamed beneficiaries' appellate standing in parens patriae cases under section 15c, the attorneys herein cite principally to class or derivative actions in support of their divergent arguments on this issue. Some courts require that an unnamed class member must have intervened or sought intervention before he has standing to appeal; others require no more than a voiced objection. For illustrative cases, see Shults v. Champion Int'l Corp., 35 F.3d 1056, 1059 (6th Cir.1994); Gottlieb v. Wiles, 11 F.3d 1004, 1008-12 (10th Cir.1993); Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1307-10 (3d Cir.1993).
 
 
 15
 Even were the courts in accord, the decisions they reach would be of questionable value in cases such as the instant one. The motivating factor in the ordinary multi-member class action is quite often simply the quest for attorneys fees. See Bell Atlantic, supra, 2 F.3d at 1309, nn. 7-9. In the instant case, the motivating factor is the enforcement of antitrust laws by the States acting as parens patriae for their citizens. See In re Grand Jury Investigation of Cuisinarts, Inc., 665 F.2d 24, 35 (2d Cir.1981), cert. denied, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). Any potential beneficiary of the States' efforts, who truly believes he can help the cause and further his own interests in the process, should not be averse to joining that effort through intervention.
 
 
 16
 In Marino v. Ortiz, 484 U.S. 301, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988) (per curiam), which involved a challenge to a consent decree approving settlement of a Title VII lawsuit against the City of New York, the petitioners appeared at the hearing in which the settlement was approved. They presented their objections to the decree but did not seek to intervene. The Supreme Court held that, because they did not intervene for purposes of appeal, they could not appeal. Id. at 304, 108 S.Ct. at 587. This, the Court said, complies with the "well-settled" rule that "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." Id.
 
 
 17
 Appellants contend that Marino "is inapplicable to parens patriae actions" (Appellants' Br. at 4) and, seeking to support this argument, they cite two cases dealing with the res judicata effect of judgments in traditional parens patriae cases involving sovereign interests, Alaska Sport Fishing Ass'n v. Exxon Corp., 34 F.3d 769, 773 (9th Cir.1994) (per curiam) and Satsky v. Paramount Communications, Inc., 7 F.3d 1464 (10th Cir.1993). Satsky correctly states the rule applicable in these cases, viz, "When a state litigates common public rights, the citizens of that state are represented in such litigation by the state and are bound by the judgment." Id. at 1470. The instant case does not present such a scenario. The purpose of Title III of Hart-Scott-Rodino, which provides for parens patriae actions by state attorneys general, was "to overcome obstacles to private class actions through enabling state attorneys general to function more efficiently as consumer advocates." Cuisinarts, supra, 665 F.2d at 35.
 
 
 18
 Appellants' dissatisfaction with the combined efforts of the States' attorneys general as the advocate of a large group of Reebok customers should not be permitted to nullify the attorneys general's accomplishments without even becoming parties to the litigation. Settlement has been achieved and the settlement monies have been paid. We see no merit in appellants' claim of standing.
 
 
 19
 On the basis of this holding, we could conclude our review of the challenged settlement approval. However, in view of the differences in the circuits on the issue of the appellate standing of unidentified class action members, we deem it advisable also to review the merits of appellants' claims, a procedure that other courts have followed for various expressed reasons. See, e.g.,
 
 
 20
 Nixon v. Warner Communications, Inc., 435 U.S. 589, 610 n. 19, 98 S.Ct. 1306, 1318 n. 19, 55 L.Ed.2d 570 (1978) (assuming arguendo that media had standing to object to deprivation of a defendant's right to public trial);
 
 
 21
 Chandler v. Judicial Council, 398 U.S. 74, 89, 90 S.Ct. 1648, 1656, 26 L.Ed.2d 100 (1970) (declining to reach jurisdiction issue where clear that requested relief is not appropriate);
 
 
 22
 Doyle v. Oklahoma Bar Ass'n, 998 F.2d 1559, 1567 (10th Cir.1993) ("to eliminate any doubt ... we elect to proceed to an alternate holding on the merits");
 
 
 23
 In re Merrill Lynch Relocation Mgmt., Inc., 812 F.2d 1116, 1121-22 (9th Cir.1987) (assuming standing where no difficulty of disposing of case on the merits);
 
 
 24
 Curry v. Baker, 802 F.2d 1302, 1313 (11th Cir.) (reaching merits where non-frivolous argument can be made for existence of standing), petition for cert. dismissed, 479 U.S. 1023, 107 S.Ct. 1262, 93 L.Ed.2d 819 (1986);
 
 
 25
 Chinese Am. Civic Council v. Attorney Gen., 566 F.2d 321, 325 (D.C.Cir.1977) (holding prudential considerations restrain court from deciding difficult standing issue where case can be readily decided on merits).
 
 
 26
 In addressing the merits, we need add little to the thorough and well-reasoned opinion of the district court, 903 F.Supp. 532, familiarity with which is assumed. Briefly stated, the district court's task was to weigh the settlement figure against the amount of a likely recovery. That, in effect, is what the district court did. It had the benefit of a report by Dr. Gary Dorman, an economist specializing in the measurement of economic damages, who calculated that the amount of the settlement substantially exceeded the damages attributable to the alleged wrongdoing. Id. at 534-36. The district court recognized that the settlement was reached through good faith bargaining at arms-length by experienced counsel. Id. at 535. It considered the merits of the States' claims and the difficulties that would be encountered in establishing a right of recovery. Id. at 536. After so doing, the district court concluded that the settlement was fair and reasonable. We find no abuse of discretion in this determination. See TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 463 (2d Cir.1982).
 
 
 27
 Turning to the method of distributing the settlement proceeds adopted by the parties, we agree with the district court that it was "fair, reasonable, and adequate." 903 F.Supp. at 538. It was estimated that over 1.7 million pairs of shoes were sold during the period at issue and, assuming wrongdoing, the damage per pair would be less than four dollars. The impracticality of attempting to distribute the settlement proceeds among the multitude of unidentified possible claimants is obvious. As the district court pointed out, such distribution "would be consumed in the costs of its own administration." Id.
 
 
 28
 Section 15e provides that the settlement proceeds shall be distributed in such manner as the district court in its discretion may authorize, subject to the requirement that the procedure adopted affords each beneficiary a "reasonable opportunity" to secure his appropriate portion of the "net monetary relief." Because of the unlikelihood of there being any significant "net monetary relief" for individual claimants if an attempt were made to distribute the settlement proceeds among them, the district court did not err in approving distribution to the States and non-profit entities to be used in providing and improving athletic equipment and facilities and related uses, areas in which Reebok equipment plays a substantial role. Distribution in this manner is not without judicial precedent. See New York v. Keds Corp., 1994-1 Trade Cas. (CCH) p 70,549, 1994 WL 97201 (S.D.N.Y. Mar. 21, 1994); New York v. Dairylea Coop., Inc., 1985-2 Trade Cas. (CCH) p 66,675, 1985 WL 1825 (S.D.N.Y. June 26, 1985).
 
 
 29
 The objections raised below by Lidsky and Paigo were addressed to the adequacy of the settlement and the manner of its distribution. They found no fault with the terminology of the settlement agreement and releases vis-a-vis those of the States' complaint. We will not hear appellants' contorted argument concerning terminology, made for the first time in this Court.
 
 
 30
 To sum up, the unlikelihood of there being any individual net recovery gives cause to wonder why appellants have made this almost frivolous effort to seek reversal. The answer, we believe, can be found in the very last sentence of their appellate brief:
 
 
 31
 Additionally, Appellants respectfully request this Honorable Court to award Appellants their appellate costs and reasonable attorney's fees, pursuant to section 4(a) of the Clayton Act, 15 U.S.C. 15(a), and any other applicable statute, rule or authority.
 
 
 32
 We dismiss the appeal herein for lack of appellate jurisdiction. However, because of the above discussed uncertainties concerning the general issue of class action standing that have not yet been eliminated by the Supreme Court, we make the additional and alternative holding that appellants' appeal is without merit.