Joy BOYLE, et al., Appellants,

v.

Teresa Herminia GIRAL,
et al., Appellees.

No. 01–CV–600, 02–CV–305.

District of Columbia Court of Appeals.

Argued April 24, 2002 and
March 25, 2003.
Decided April 10, 2003.

George A. Barton, with whom David Schertler and Lisa Fishberg were on the briefs, for appellants.

John M. Majoras, Washington, DC, with whom Julie E. McEvoy and Heather Guilette Walser were on the briefs, for appellee Settling Defendants.

Jeffrey A. Bartos, Washington, DC, with whom Jonathan Rolfe and Timothy D. Battin were on the briefs, for appellee Class Plaintiffs.

Bennett Rushkoff, with whom Robert R. Rigsby, Corporation Counsel at the time the brief was filed for appeal No. 01–CV–600, Arabella W. Teal, Corporation Counsel at the time the brief was filed for appeal No. 02–CV–305, and Charles L. Reischel, Deputy Corporation Counsel, were on the briefs, for appellee District of Columbia.

Before TERRY, FARRELL and REID, Associate Judges.

REID, Associate Judge:

Before us are consolidated appeals involving challenges to the trial court's (1) denial of motions to intervene filed by appellants Joy Boyle, Daniel Owen and others (collectively "the consumer class member objectors") in a class action suit against various vitamin product manufacturers and distributors; and (2) final approval of the class action settlement agreement which, instead of a distribution to individual members of the consumer class, provides for a *cy pres* allocation to a fund administered by the District of Columbia "for the improvement of the health and/or nutrition of the citizens of the District [ ] and/or the advancement of nutritional, dietary or agricultural science in the District [ ]."

■ We conclude that it is unnecessary to resolve the consumer class objectors' intervention arguments, because the objectors filed written statements in opposition to the settlement agreement and were permitted to make oral arguments during the trial court's final hearing to determine the fairness of the agreement. Thus, the

denial of intervention has caused them no prejudice. Moreover, we assume, without deciding, that *Devlin v. Scardelletti*, 536 U.S. 1, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002), allows the consumer class member objectors to bring an appeal to this court without first achieving the status of an intervenor. On the merits, we reject the argument that class counsel had a conflict of interest in representing both the consumer and the commercial settlement classes. And we further hold that the trial court did not abuse its discretion in approving the final settlement agreement, and that a *cy pres* distribution on behalf of the District's consumer class is appropriate here, where there is no reasonable opportunity to award each individual member of the class an appropriate portion of the net monetary relief, amounting to the *de minimis* sum of approximately $1 per District resident.

## FACTUAL SUMMARY

In September 1998, Teresa Herminia Giral, a resident of the District of Columbia, and an indirect purchaser of vitamin products, filed a class action antitrust complaint against F. Hoffman LaRoche, Ltd. (one of the settling defendants in this case) and other distributors and sellers of vitamin products.[1] She primarily alleged that the defendants engaged in a conspiracy in restraint of trade through a price-fixing and market allocation scheme, in violation of the District of Columbia Antitrust Act, D.C.Code §§ 28–4501 *et seq.* (1996), and the District of Columbia Consumer Protection Procedures Act, D.C.Code §§ 28–3901 *et seq.* (1996). Subsequently, Ms. Giral added plaintiffs, consumers and businesses, from various states, as well as other defendants.

---

**1.** The Giral plaintiffs filed a second amended complaint in 2001, which, in part, identified the violation period as 1989 to September 1998.

The Giral litigation was stayed in May 1999, to accommodate dispute resolution efforts. As a result of those efforts, the Giral plaintiffs filed a motion in December 2000, for preliminary approval of a partial settlement with seven primary defendants.

Also in December 2000, the District of Columbia successfully filed a motion to intervene on the side of the Giral plaintiffs, as *parens patriae* for District consumer residents.[2] Efforts to intervene made by commercial indirect purchasers of vitamin products who were residents of Minnesota, and by consumers led by Joy Boyle,[3] were unsuccessful as the trial court denied their motions in March 2001.

One month later, the trial court granted preliminary approval of the proposed settlement agreement, and scheduled a hearing to address the fairness of the agreement. Prior to the Fairness Hearing, consumers Daniel Owen and Elizabeth Huybens sought to intervene for the purpose of objecting to the settlement agreement, but their motion was denied.[4]

Although the Boyle and Owen consumers' motions to intervene were denied, their opposition to the settlement agreement was conveyed through counsel at the February 2002 Fairness Hearing; and their written opposition was considered by the trial court. The trial court approved the settlement agreement on March 4, 2002, and the consumer class objectors noted an appeal.

## ANALYSIS

The Boyle and Owen consumer class member objectors contend that the trial court erred in approving the settlement agreement, in part because: "All of the commercial class members have the opportunity to receive their proportionate shares of the commercial [c]lass settlement fund, but the consumer [c]lass members get nothing." They attribute the lack of a direct cash disbursement to members of the consumer class to "a clear conflict of interest" on the part of class counsel in their representation of the commercial class as well as the consumer class, and maintain that each class should have its own attorney "to ensure that the rights of each [c]lass member are adequately represented." The Giral consumers, who participated in the settlement negotiations, assert that the objectors' conflict of interest argument "is both legally and factually unsupportable."

---

2.  D.C.Code § 28–4507(b) authorizes the District to pursue a *parens patriae* action for its residents:

    (b) The Corporation Counsel may bring a civil action in the name of the District of Columbia as parens patriae on behalf of any individual residing in the District of Columbia in any court of competent jurisdiction for injury sustained by such individual to such individual's property by reason of any violation of [the Antitrust Act].
    
    (1) The court shall award the District of Columbia, as monetary relief, threefold the total damages sustained by such natural persons, and the cost of suit, including reasonable attorney's fees.
    
    (2) Monetary relief recovered in an action under this subsection shall:

    (A) be distributed in such manner as the court may authorize; or
    
    (B) be deemed a civil penalty by the court and deposited with the District of Columbia, subject in either case to the requirement that any distribution procedures adopted shall first afford each person a reasonable opportunity to secure each such person's appropriate portion of the net monetary relief.

3.  Ms. Boyle is a resident of the District of Columbia. The other Boyle consumers consisted of a former resident of the District, and two Kansas residents.

4.  Mr. Owen and Ms. Huybens are both residents of the District.

*The Conflict of Interest Issue*

We note at the outset that before the consumer and commercial classes were certified, no objection was raised as to any actual or potential conflict on the part of class counsel. Indeed, the conflict of interest allegation did not surface until approximately one month prior to the February 2002 Fairness Hearing on the settlement agreement, long after the commencement of the case in 1998, and the settlement negotiations. The basis of the conflict alleged by the objectors appears to center on the distribution of settlement funds directly to commercial class members, and only indirectly to consumer class members.[5] No disagreement with the amount of the settlement fund for the consumer class and for the commercial class has been raised; indeed the settlement funds have been divided equally between the consumer and the commercial classes.[6]

■ To determine the adequacy of representation by class counsel, which "factors in competency and conflicts of class counsel," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), we apply the following legal principle: " '[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625–26, 117 S.Ct. 2231 (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (internal quotation marks and other citation omitted)). In pressing their allegation of a conflict of interest, the consumer class member objectors rely on *Amchem* and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). Neither case supports the objectors' conclusory conflict of interest allegation.

■ *Amchem* and *Ortiz, supra*, concerned asbestos claims by persons who did not have the same interest or injury due to differing levels of exposure to asbestos, and differing levels of injury—from no manifestation of illness, which afforded time to seek maximum recovery of damages, to life-threatening conditions requiring immediate recovery of monetary relief. The record was replete with documentation of the differences in exposure and levels of injury. Here, in contrast to the claimants in *Amchem* and *Ortiz*, the consumer and commercial classes suffered similar injuries in that they both paid for overpriced vitamin products; and both classes have an interest not only in eliminating price-fixing and manipulation of market allocation in the sale and distribu-

---

5. In paragraph 16 of their January 2002 motion to intervene, the Owen consumers state:
   Consumer intervenors object to the proposed consumer class settlement because the [c]lass counsel have a conflict of interest in representing both the [c]onsumer [c]lass members and the [c]ommercial [c]lass members. The [c]ommercial [c]lass members will receive their proportionate share of the [c]ommercial [c]lass settlement amount of $2,233,000. The [c]onsumer [c]lass members do not receive their proportionate share of the [c]onsumer [c]lass settlement because their share has been allocated to a political subdivision, a not-for-profit corporation, or a charitable organization. As the remedy for the commercial class is radically different from the remedy afforded the [c]onsumer [c]lass, it is inappropriate for counsel to purportedly represent both classes.

6. As the consumer class member objectors indicate in their brief, $107,625,000 was allocated to the commercial class and $107,625,000 to the consumer class. The District's share of the consumer class settlement funds "includes $522,000 to be paid into a District of Columbia Class Escrow Account, for future distribution to designated charities and nonprofit groups, and $48,000 into a District of Columbia State Economic Impact Fund Escrow Account."

tion of vitamin products, but also in deterring such conduct in the future. And, unlike *Amchem* and *Ortiz,* there is no factual record to support the objectors' conflict of interest allegation.

While the commercial class in the case before us is composed of indirect purchasers of vitamin products for resale, and the consumer class consists of indirect purchasers of the products for personal consumption, that distinction is insufficient, by itself, to overcome the presumption of adequate, conflict-free representation by class counsel. *See Vale Props., Ltd., v. Canterbury Tales, Inc.,* 431 A.2d 11, 15 (D.C. 1981) ("A presumption of adequate representation will arise ... when an existing party seeks the same ultimate objective as the applicant"; and " '[A] slight difference in interests between the applicant and the supposed representative' will not suffice to show inadequacy of representation.") (citations omitted). Furthermore, no irregularity in the structure or process of the settlement negotiations, or the behavior of class counsel, has been called to our attention, which would justify the objectors' insistence on representation by "[class] counsel who were exclusively devoted to the interests of the [c]onsumer [c]lass members, and who would not be tempted to subordinate the interests of the [c]onsumer [c]lass in the pursuit of a satisfactory remedy for the [c]ommercial [c]lass members." Indeed the record on appeal is absolutely devoid of any hint of a conflict of interest by class counsel, and the allegation was not even aired during the Fairness Hearing.

■ There is an additional reason why the consumer class member objectors' conclusory conflict of interest allegation must be rejected. The District government, through its chief legal officer, the Corporation Counsel, participated in the settlement negotiations on behalf of District residents. A presumption of adequate representation exists where the government is involved. *See District of Columbia v. Greater Washington Cent. Labor Council,* 442 A.2d 110, 120 (D.C.1982); *see also In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347, 351 (E.D.N.Y.2000) ("[T]he participation of [government attorneys] furnishes extra assurance that consumers' interests are protected."). Since there is nothing in the record that rebuts that presumption, we conclude that the interests of the consumers were protected not only by class counsel, but also by government counsel. In fact, the trial court's determination that no conflict of interest existed is compelling in the absence of any factual record showing an actual or potential conflict of interest on the part of class counsel. As the court stated:

> The Court finds no conflict of interest [traceable to class counsel's representation of] both the [consumer class] and the [commercial class]. No objection based on any alleged conflict of interest has been raised by anyone other than lead counsel for the four individual objectors (who did not argue this point in the Fairness Hearing).

### The Trial Court's Approval of the Settlement Agreement

The consumer class member objectors' main complaint about the settlement agreement is that, unlike commercial class members, consumer class members will not receive direct cash distributions. They vigorously attack the *cy pres* distribution approved by the trial court, and contend that D.C.Code § 28–4507(b)(2)(B) "mandates" that members of the consumer class receive direct monetary relief.

■ Our review of "a trial court's approval of a settlement agreement under the local *parens patriae* statute or in the

analogous context of class actions ... [is] limited," and we give "great weight [to the trial judge's] views because he [or she] is exposed to the litigants, and their strategies, positions and proofs." *Shepherd Park Citizens Ass'n v. General Cinema Beverages of Washington, D.C., Inc.,* 584 A.2d 20, 22 (D.C.1990) (citations omitted). "Appellants must show that the [trial] [c]ourt abused its discretion: this generally requires a showing either that the agreement in question was so manifestly unfair as to preclude judicial approval, or that the court did not have sufficient facts before it to make an informed judgment." *Id.* at 22 (citation omitted).

The Honorable Joan Zeldon dismissed the objections of the consumer class member objectors to the final approval of the settlement agreement because they were "not meritorious"; there is nothing in the record to suggest that the settlement was "manifestly unfair" or that the trial court had insufficient facts before it to make an informed judgment. *Shepherd Park, supra,* 584 A.2d at 22. Specifically, the judge declared:

> It would be utterly impracticable for the [s]ettlement to provide individual compensation to the [c]onsumer [s]ettlement [c]lass members. Very few consumers could be expected to have kept proof of purchase of goods containing vitamins as far back, in some cases, as 1990. The difficulty and cost of identifying and paying individual claimants would likely use up the fund provided for the [c]onsumer [c]lass [s]ettlement. The Court is satisfied with the appropriateness of the entities selected to receive settlement monies allocated for the [c]onsumer [s]ettlement [c]lass, using a *cy pres* recovery approach, which has been sanctioned by the District of Columbia Court of Appeals. *See Shepherd Park* [*, supra,*] 584 A.2d [at] 26.

Based upon the affidavit of Neil Zola, Vice President for the Garden City Group, the settlement administrator, the trial court considered the *cy pres* distribution for the consumer class to be fair and reasonable:

> Due to the impracticability of identifying particular injured consumers of [i]ndirect [v]itamin [p]roducts during the [r]elevant [p]eriod and the high costs of administering a direct cash distribution to hundreds of thousands of District of Columbia individual consumers relative to the average likely award to those consumers, the Court finds that a *cy pres* distribution administered by the District of Columbia Corporation Counsel to eligible organizations for the express purpose of ensuring the fund to be used for the improvement of the health and/or nutrition of the citizens of the District of Columbia and/or the advancement of nutritional, dietary or agricultural science in the District of Columbia is fair, reasonable, and adequate and in the best interests of the District of Columbia [c]onsumer [s]ettlement [c]lass.

Nevertheless, the objectors urge us to reverse the trial court's final approval of the settlement agreement on the ground that it violates D.C.Code § 28–4507(b)(2)(B), which requires that "any distribution procedures adopted shall first afford each person [sustaining damages] a reasonable opportunity to secure each such person's appropriate portion of the net monetary relief."

We do not accept the objectors' argument that § 28–4507(b)(2)(B) compels a direct distribution of monetary relief to each member of the consumer class, and that the *cy pres* distribution violates § 28–4507(b)(2)(B) as a matter of law. "Subsection (b) authorizes the District to sue [or, as in this case, to intervene] as *parens patriae* on behalf of its resident natural persons for their injuries resulting from

any antitrust violation set forth in [the District of Columbia Antitrust Act]." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 3–107, THE DISTRICT OF COLUMBIA ANTITRUST ACT OF 1980, October 8, 1980, at 15 ("Council Report"). We apply principles of statutory interpretation to understand the meaning and scope of subsection (b) within the context of a class action in which the District government intervenes as *parens patriae*, and in which the monetary relief per consumer is *de minimis*.

We look to the plain meaning of a statute first, construing words according to their ordinary meaning. *See J. Parreco & Son v. Rental Hous. Comm'n*, 567 A.2d 43, 45 (D.C.1989). "The literal words of [a] statute, however, are 'not the sole index to legislative intent,' but rather, are 'to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice.'" *District of Columbia v. Gallagher*, 734 A.2d 1087, 1091 (D.C. 1999) (quoting *Metzler v. Edwards*, 53 A.2d 42, 44 (D.C.1947) (footnotes omitted) (other citations omitted)). Furthermore, "'if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them....'" *Luck v. District of Columbia*, 617 A.2d 509, 514 (D.C.1992) (quoting *United States v. Freeman*, 44 U.S. (3 How.) 556, 564–65, 11 L.Ed. 724 (1845) (other citations omitted)). If related statutes conflict, we must reconcile them. *See Gonzalez v. United States*, 498 A.2d 1172, 1174 (D.C.1985).

A reading of the plain words of § 28–4507(b)(2)(B), giving them their ordinary meaning, establishes that a consumer is not guaranteed net monetary relief on an individual basis. Rather, what is guaranteed is "a reasonable opportunity to secure ... [an] appropriate portion of the net monetary relief." Here, after hearing oral arguments and examining affidavits and the settlement negotiations, the trial court concluded that there was no reasonable way to make a direct distribution of cash to each individual consumer. A similar conclusion was reached by the United States District Court for the Southern District of New York, and approved by the Second Circuit, in *New York v. Reebok Int'l Ltd.*, 96 F.3d 44 (2d Cir.1996). There, the court faced language virtually identical to § 28–4507(b)(2)(B) in construing a provision of the federal antitrust law, 15 U.S.C. § 15e. As the court stated in *Reebok*:

Section 15e provides that the settlement proceeds shall be distributed in such manner as the district court in its discretion may authorize, subject to the requirement that the procedure adopted affords each beneficiary a "reasonable opportunity" to secure his appropriate portion of the "net monetary relief." Because of the unlikelihood of there being any significant "net monetary relief" for individual claimants if an attempt were made to distribute the settlement proceeds among them, the district court did not err in approving distribution to the States and non-profit entities to be used in providing and improving athletic equipment and facilities and related uses, areas in which Reebok equipment plays a substantial role. Distribution in this manner is not without judicial precedent. *See New York v. Keds Corp.*, 1994 WL 97201, 1994 U.S. Dist. LEXIS 3362 (S.D.N.Y. Mar. 21, 1994); *New York v. Dairylea Coop., Inc.*, [1985 U.S. Dist. LEXIS 18501] (S.D.N.Y. June 26, 1985).

*Id.* at 49.

Since the federal antitrust law is a "source" for the District of Columbia Anti-

trust Act, *see* Council Report at 4, we will follow the Second Circuit's interpretation and hold, in this case, that the trial court did not err in granting final approval to the settlement agreement because it does not violate D.C.Code § 28–4507(b)(2)(B). There is no reasonable opportunity to award each individual member of the consumer class an appropriate portion of the net monetary relief, given the relatively small size of the District's share of the consumer settlement fund, the prohibitive costs of administering a distribution system, and the difficulty of identifying District residents who were indirect purchasers of vitamin products.[7]

■■■ We turn now to the appropriateness of a *cy pres* distribution.[8] We determined that § 28–4507(b)(2)(B) was not a bar in *Shepherd Park, supra,* to the approval of a distribution of *parens patriae* settlement monies into a fund administered by the District of Columbia Corporation Counsel.[9] But, since the appellant objectors' in *Shepard Park* were in fact arguing for a *cy pres* distribution (rather than for the funds to be deposited into the District of Columbia anti-trust fund), we have not had occasion before to consider whether § 28–4507(b)(2)(B) requires at least a portion of the class settlement funds to be distributed to consumer class members before a *cy pres* distribution can be made.

Although *cy pres* distributions (also known as fluid recoveries) in class actions received early criticism, *see Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005 (2d Cir. 1973), that criticism has diminished considerably. Such distributions, including the entire amount of the consumer settlement fund rather than just the residue, are being used or advocated increasingly where direct distribution of settlement funds to individual class members is impractical; and where important consumer goals, such as disgorgement of ill-gotten gains from and deterrence of future over-pricing and manipulation of market allocation by the offending entities, can be achieved.[10] *See,*

7. The consumer class member objectors claim that not many consumers will seek a cash distribution; therefore, the distribution system would be manageable. No record evidence supports this claim. Equally significant, even if such evidence were part of the record, distribution of all of the District's consumer class settlement funds to a handful of consumers would represent a windfall to them, and would not achieve the same objectives as would a *cy pres* distribution.

8. "The term '*cy pres*' appears to derive from the Norman–French term '*cy pres comme possible,*' meaning 'as near as possible.' *Cy pres* is a rule of construction which courts employ to carry out the spirit of a trust's terms when literal application of such terms is not feasible." Susan Beth Farmer, *More Lessons From the Laboratories: Cy Pres Distributions in Parens Patriae Antitrust Actions Brought By State Attorneys General,* 68 FORDHAM L. REV. 361, 406 n. 212 (1999).

9. We approved the "deposit of [civil] penalty [funds] in the [District of Columbia] antitrust fund" under D.C.Code § 28–4516 because of "the sheer impracticality of providing individual compensation under D.C.Code § 28–4507(b)(2)(B)." As we pointed out, "very few consumers could be expected to have kept receipts or other proof of purchase for soft drinks, purchased four to five years earlier, and the amount estimated to be due each affected consumer was about forty-five cents. Thus the trial court sensibly concluded that the costs of distributing the recovery to affected purchasers would greatly exceed any individual benefit to them." *Shepherd Park, supra,* 584 A.2d at 26.

10. *See* Stan Karas, Note, *The Role of Fluid Recovery in Consumer Protection Litigation: Kraus v. Trinity Management Services,* 90 CAL. L. REV. 959 (2002); Farmer, *supra;* Natalie A. DeJarlais, Note, *The Consumer Trust Fund: A Cy Pres Solution to Undistributed Funds in Consumer Class Actions,* 38 HASTINGS L.J. 729 (April 1987). The DeJarlais Note indicates: "In the class action context, *cy pres* mechanisms have become both

*e.g., Reebok, supra; New York v. Keds Corp., supra; see also In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 179 (2d Cir.1987). We agree with the trial court that a *cy pres* distribution in this case is appropriate.[11] "The infeasibility of [direct] distribution [to individual members of the consumer class] was ample justification for placing the money in a fund available for [activities] in the public interest," *Shepherd Park, supra,* 584 A.2d at 26. We are satisfied that the fund will benefit consumers; as the District notes in its brief:

> The proposed recipients under the *cy pres* plan would serve District of Columbia residents by expanding pediatric services, operating a medical clinic, counsel-

ing pregnant adolescents, offering health-related education to schoolchildren, and enforcing the District's consumer protection law.

Under the circumstances, we discern no abuse of discretion in the trial court's approval of the settlement agreement.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

useful and controversial means of distributing benefits to the 'next best' class when injured class members, for whatever reason, cannot be compensated individually." *Id.* at 730 and n. 11. The *cy pres* distribution in class actions is deemed controversial because there are two separate schools of thought regarding such distributions. One school insists that class counsel have a fiduciary duty to ensure direct distribution to class members; the other advocates the *cy pres* distribution for circumstances where the cost of individual distribution is prohibitive or the fund is too small to warrant individual recovery. *See* Stephen Gardner, *National Association of Consumer Advocates Standards and Guidelines for Litigating and Settling Consumer Class Actions,* 772 PLI/Comm 441, 469 (1998).

11. There is statutory support for the appropriateness of a *cy pres* distribution in the District. For example, § 28–3911(a) of the Consumer Protection Procedures Act recognizes that *"cy pres* payments [may be] made to support consumer protection activities by the Corporation Counsel," and may be deposited into a Consumer Protection Fund, which is akin to the type of distribution anticipated in this case. In addition, § 28–4508(c) of the Antitrust Act permits purchasers involved in a consumer class action to prove damages "on a class-wide basis, without requiring proof of such matters by each individual member of the class." And while this subsection provides a formula for calculating "[t]he percentage of total damages attributable to a member of [the consumer] class," it does not prohibit a class-wide solution in the form of a *cy pres* distribution.