**In re TOYS "R" US ANTITRUST LITIGATION.**

No. 98 M.D.L.1211(NG)(JLC).

United States District Court,
E.D. New York.

Feb. 17, 2000.

---

348

## OPINION AND ORDER

GERSHON, District Judge.

On October 13, 1998, the Federal Trade Commission ("FTC") issued a final Order and comprehensive opinion approving the findings of an administrative law judge, rendered on September 25, 1997, that Toys "R" Us ("TRU") had engaged in anti-competitive conduct that violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 5 of the FTC Act, 15 U.S.C. § 45. The FTC found that TRU had unlawfully used its dominant market power in order to orchestrate and enforce agreements between itself and toy manufacturers and among toy manufacturers to restrict the sale of toys to so-called "wholesale" clubs (referred to here as "Warehouse Clubs"), such as Sam's Club, Price–Costo, and BJ's Wholesale Club. These Warehouse Clubs, an innovative class of discount retailer, typically sell goods at low cost with no frills at facilities restricted to "members". The FTC found that, instead of meeting competition from the Warehouse Clubs in the marketplace, TRU communicated with the toy manufacturers that supplied both TRU and the Clubs and induced many of them to agree, with TRU and with each other, either not to sell certain toys to the Warehouse Clubs or to sell to them only upon unfavorable terms and conditions that stifled effective price competition and prevented comparison-shopping by consumers. The FTC enjoined TRU from engaging in such conduct with respect to sales to any toy discounter (not limited to membership clubs), and from engaging in other conduct, such as gathering and sharing of information, that had facilitated the unlawful activity found. The FTC Order also imposed record keeping and reporting requirements upon TRU. That Order is presently on appeal to the United States Court of Appeals for the Seventh Circuit.

Meanwhile, in the wake of the decision of the FTC administrative law judge, dozens of federal antitrust class actions, brought on behalf of nationwide classes of consumers, have been filed in district courts across the country. State actions alleging violations of antitrust, unfair competition, and consumer protection laws also have been filed, some in the early stages of the FTC proceeding, which had been commenced on May 22, 1996. In addition, New York filed suit as *parens patriae* on behalf of the toy-consuming public in October 1997, and later forty-three other States as well as the District of Columbia and the Commonwealth of Puerto Rico joined the suit, seeking recovery for injuries suffered by the States and their residents.

On February 11, 1998 all district court actions were transferred for pretrial purposes to this court. On April 22, 1998 an amended *parens patriae* complaint was filed, and on April 27, 1998, a consolidated class action complaint was filed. Both the consolidated class action and the amended State *parens patriae* action name as defendants TRU and manufacturers Hasbro, Mattel, Little Tikes and Tyco, while the class action also asserts claims against additional manufacturers Fisher Price, Binney & Smith, Huffy Corporation, Just Toys, Lego Systems, Rubbermaid, Inc., Sega of America, Tiger Electronics, Today's Kids and V–Tech Industries.

The consolidated class action complaint seeks injunctive relief and treble damages on behalf of a class consisting of all consumers who purchased toys from TRU between January 1, 1990, and the filing of the complaint. The complaint alleges that, through the use of its market power as a retailer of toys, TRU engineered unlawful vertical and horizontal agreements between itself and toy manufacturers and among toy manufacturers, which restricted sales of toys to Warehouse Clubs. As a result, according to the complaint, class members were denied the opportunity to purchase popular toys at competitive prices and paid artificially high prices for those toys. The amended *parens patriae* complaint is not limited to seeking recovery on behalf of consumers who purchased toys from TRU; instead, the complaint seeks injunctive relief and treble dam-

ages on behalf of all persons represented by the States who purchased toy products from retailers, including mass merchandisers as well as TRU, at prices that were affected by the alleged unlawful agreements, between 1989 and the present. The complaint alleges that, as a result of the agreements induced or orchestrated by TRU, competition among toy manufacturers was restrained and retail prices paid by consumers of the affected toys were inflated. The amended *parens patriae* complaint is based on federal antitrust law and each State's antitrust, unfair competition, or other related laws.

Following mediation, all parties have now reached Settlement Agreements and have submitted those Agreements (in eight separate documents) to the court for approval. With the main exception of the amounts and timing of contributions, and the allowable amounts for attorneys' fees, costs, and payments to funds established by the Attorneys General, the Settlement Agreements are essentially the same. The Settlement Agreement reached jointly with Binney & Smith, Huffy, Tiger and V–Tech also authorizes the court to direct payment from the Settlement Fund of $25,000 for costs incurred by Toys for Tots in administering the toy distribution, described below.

### Terms of the Settlements

The Settlement Agreements provide for a combined payment by defendants of almost $57 million in toys and cash, over $20.3 million of which will be in cash and over $36.6 million in toy distributions. The distributions of toys and cash will not be to individual purchasers of toys but rather will be distributed nationally to or through public and charitable entities. In addition, the Settlement Agreements include injunctive relief. An injunction has already been imposed against TRU by the FTC, but that injunction is on appeal to the Seventh Circuit. The Settlement with TRU in this case provides that the FTC injunction is incorporated into the terms of the judgment issued by this court as well, and is enforceable to the extent that the injunction has not been stayed and will continue to be enforceable to the extent that it is upheld in the courts. However, the Settlement Agreements contain injunctive re-

lief against TRU that will apply regardless of the outcome of the FTC litigation as well as injunctive relief against the manufacturing defendants, none of whom is the subject of the FTC proceeding. Specifically, regardless of the outcome of the FTC proceeding, for a period of three years, TRU is enjoined from entering into, or facilitating, any agreement, contract or conspiracy with or among suppliers to restrict the United States sales of products to Warehouse Clubs, in violation of state or federal antitrust laws. The manufacturing defendants, who are not subjects of the FTC proceeding, are prohibited, for a period of three years, from entering into any contract or conspiracy with TRU or any other toy manufacturer to restrict the United States sales of products to Warehouse Clubs, in violation of state or federal antitrust laws.

The Settlement Fund, that is, the cash portion of the Settlements, will be allocated among all of the States, the District of Columbia and the Commonwealth of Puerto Rico based on each entity's percentage share of the total population of the United States and will be provided to the States, political subdivisions of the States, non-profit corporations and/or charitable organizations within each State as determined by the State subject to the court's approval. The monies must be used to benefit children by providing them with toys, books or other educational materials that would not otherwise be provided by the State or local governments. Thus, every State, regardless of whether it participated in this litigation, will receive its fair share of the settlement monies for the benefit of its residents. Each State's Proposed Plan of Distribution of the cash is before the court. After payment of attorneys' fees, costs and expenses incurred in the notice and administration of the Settlements, approximately $13 million will be available for distribution. The States' plans differ, and all but two have already satisfied the requirement of benefit to children under the specified criteria and are therefore approved by the court.[1]

New York and several other states, for example, have selected programs which promote literacy in children, such as the Reading is Fundamental Program and The Books for Kids Foundation that New York has selected to receive portions of its funds. The District of Columbia will distribute a portion of its funds to a program to assist victims of child abuse, and the remainder to its public library. Colorado has designated the Colorado Coalition for the Homeless to receive its share of the funds to benefit homeless children. Other programs selected by the States include programs to benefit children with disabilities, book purchases by schools, furnishing school supplies and computers for schools or needy children, and many other worthwhile projects. Distribution of the toys, which will also be on a nationwide basis, is discussed in more detail below.

### Preliminary Approval

On July 9, 1999, this court granted preliminary approval of the Settlement Agreements and of a Notice Plan. In light of the complexity and novelty of the settlement issues presented, the court engaged in extensive evaluation of the Settlements, and how they would be effectuated in practice, before granting preliminary approval.

### Notice

The Notice advised consumers of their options to seek exclusion and to object to the Settlements and further advised them of how to get further information regarding the Settlements. While not sent to individual consumers, the Notice was well calculated to reach the toy consuming public throughout the country. Notice was published in national magazines and newspapers and on the internet. In addition, press releases were issued, and there were numerous press and media reports regarding the litigation and the proposed settlements. It has been reasonably estimated that the notice reached tens of millions of toy purchasers. Congress specifically directed notice by publication in

---

1. The proposed distribution plan of the State of Alaska is too vague to be approved by the court. Distribution of cash to Alaska must therefore await submission of a more detailed plan from which the court can determine whether the Settlement criteria are met.

The State of Texas has stated that it cannot submit a plan until action is taken by the state legislature, which reportedly will not meet until January 2001. Therefore, no funds are to be distributed to the State of Texas until a plan is submitted and approved by this court.

*parens patriae* actions brought by State Attorneys General seeking recovery for antitrust violations on behalf of their residents and provided that further notice would be required only if the court found that due process required it. 15 U.S.C. § 15c(b)(1); *see New York v. Reebok Int'l, Ltd.,* 903 F.Supp. 532, 533 & n. 1 (S.D.N.Y.1995), *aff'd,* 96 F.3d 44 (2d Cir.1996) (approving notice by publication in *parens patriae* antitrust action). I am satisfied that the notice also met the requirements of Rule 23 and of due process under all of the circumstances, including the unusual context of the joint litigation and proposed settlement involving private plaintiffs and the States, the inordinate expense of providing individual notice, the unfeasibility of individual actions or recoveries by consumers, and the joint interests of the class members. *See Handschu v. Special Services Div.,* 787 F.2d 828, 832–33 (2d Cir.1986); *In re Domestic Air Transp. Antitrust Litigation,* 141 F.R.D. 534, 548–53 (N.D.Ga.1992).

**Class Certification**

■ Under *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), a court determining whether to approve a class action settlement must first determine that a class is certifiable under Rule 23. (Rule 23 is inapplicable to *parens patriae* actions, since the Attorneys General are specifically authorized by statute to sue). In making the determination concerning class certification, however, the court may consider the special circumstances of a request for settlement-only class certification and need not inquire into certain problems that would arise only if the case were to proceed to trial, such as the difficulty of trial management. *Id.* at 619–20, 117 S.Ct. 2231. Here there can be no doubt that class certification is proper. The class plaintiffs, purchasers of toys from TRU, easily meet the Rule 23(a) standards of numerosity making joinder impractical; commonality of issues of law; and the typicality of both claims and defenses. *See Amchem,* 521 U.S. at 616, 117 S.Ct. 2231 (quoting with approval Advisory Committee's reference to the desirability of a class action when "the amounts at stake for individuals may be so small that separate suits would be impractical"). While some defendants have indicated that, if the case

did not settle, they would raise questions about the viability of a class, those questions relate principally to damages issues and do not affect the existence of common claims and defenses. Indeed, there is a central common issue as to the existence of illegal vertical and horizontal agreements, as well as other subsidiary common claims and defenses. In addition, class counsel are highly skilled and experienced and can fairly and adequately represent the interests of the class. This litigation does not present the conflicts of interest, potential unfairness to absent class members, and abuse of class action procedures by overbroad class determinations that troubled the Court in *Amchem,* 521 U.S. at 619–21, 624–28, 117 S.Ct. 2231. Moreover, the participation of the State Attorneys General furnishes extra assurance that consumers' interests are protected.

Rule 23(b) also is satisfied. The request for injunctive relief meets the requirements of Rule 23(b)(2), since the defendants are alleged to have acted or refused to act on grounds generally applicable to the class. Class treatment also is appropriate under Rule 23(b)(3). Common issues predominate over any issues affecting only individual members, and a class action is superior to thousands of individual actions. *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

**Evaluation of the Settlements**

■ "The law favors settlements of class actions no less than of other cases." *In re Gulf Oil/Cities Service Tender Offer Litig.,* 142 F.R.D. 588, 590 (S.D.N.Y.1992) (citing *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982)). "The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate." *Weinberger,* 698 F.2d at 73.

■ Guidelines for evaluating whether the settlement is fair and the class members' interests adequately protected are well established in this circuit. They include the complexity, expense and likely duration of the underlying litigation; the risks of litiga-

tion for all parties; comparison of the proposed settlement with the likely result of litigation; the scope of discovery preceding settlement; the ability of the defendant to satisfy a greater judgment; and the reaction of the class to the settlement. *See In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir.1992) (citing *Weinberger,* 698 F.2d at 73–74); *In re Warner Communications Sec. Litig.,* 798 F.2d 35, 37 (2d Cir.1986); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974). The court must also examine the negotiating process that gave rise to the settlement to determine if it was achieved through arms-length negotiations by counsel with the experience and ability to effectively represent the class's interests. *Weinberger,* 698 F.2d at 74 (citation omitted). The standards for approving a *parens patriae* suit are the same. *Reebok,* 903 F.Supp. at 535–36; *New York v. Keds Corp.,* 1994–1 Trade Cas. (CCH) ¶ 70,549, 1994 WL 97201, at \*2–3 (S.D.N.Y. Mar. 21, 1994); *New York & Maryland v. Nintendo of America, Inc.,* 775 F.Supp. 676, 680–81 (S.D.N.Y.1991).

The plaintiffs in these suits, both the class and the States, had the benefit of the results of the FTC investigation, including thousands of documents, and the FTC's findings. In addition, they conducted independent investigations, and both the States and the class plaintiffs hired economics experts to explore damages issues. Most significantly, the settlements were reached only after arduous settlement discussions conducted in a good faith, non-collusive manner, over a lengthy period of time, and with the assistance of a highly experienced neutral mediator with a background in antitrust law, retired federal judge Charles B. Renfrew. See *Weinberger,* 698 F.2d at 74 (important indicia of propriety of settlement negotiations include absence of any indication of collusion, protracted settlement negotiations, ability and experience of counsel, extent of discovery, and access to other materials including the fruits of detailed discovery by trustee "who commanded financial resources and professional assistance ... not always available to plaintiffs' counsel in class actions"); *Reebok,* 903 F.Supp. at 535. In addition to the other voluminous papers that have been submitted

to the court in support of the settlements, the mediator has himself filed a declaration setting forth the manner in which the mediation was conducted, some of the many issues, logistical and substantive, that had to be overcome, and the "decisive and vigorous role" played by both private counsel and the States' Attorneys General in achieving settlement.

The amounts of the Settlements are fair and reasonable. The States' economist, Dr. David Eisenstadt, computed the damages suffered by toy consumers in the United States during the period between 1992 and 1998 based upon available data provided by plaintiffs. He concluded that both customers of TRU and customers of mass merchandisers such as WalMart, Kmart and Target would have bought the same toys at Warehouse Clubs at a lower price. In total, he concluded that the damages were $52,500,000 at nominal value, *i.e.,* the actual dollar difference between prices paid and prices that would have been paid absent the alleged unlawful conduct, and $63,200,000 at present value, *i.e.,* after calculating lost opportunity cost from the extra discretionary income purchasers would have had if they had paid a lower price originally. The preliminary damages estimates of the class plaintiffs' expert, while significantly higher, are far more qualified and uncertain and therefore provide no sound basis for a different evaluation of the damages. In light of Dr. Eisenstadt's computations, the proposed settlements totaling almost $57 million are clearly adequate.

The toys are valued at manufacturer's list price at the time of distribution except for TRU, whose toys are valued at the average retail price at which TRU initially offered its products in its stores ("Original Retail Price"). Although the toys are not valued at their cost to TRU and the manufacturers, the cost to the defendants is nonetheless substantial in comparison to the estimated damages. Together with the required cash payments, they serve as a sufficient deterrent to unlawful behavior.

While the plaintiffs believe they have a strong case, and the FTC findings support that view as to TRU, those findings are on

appeal to the Seventh Circuit, which may not agree. The Settlements assure that, whatever the Seventh Circuit may decide, the customers of TRU will benefit from equitable relief as well as from the deterrent effect of a large monetary burden on the defendants. Moreover, the FTC did not name the manufacturer defendants in its proceeding, and those defendants, in addition to any defenses they may share with TRU, may also claim that, insofar as TRU violated the antitrust laws, they are victims rather than perpetrators of antitrust violations.

TRU has vigorously disputed the FTC's findings and asserts that the FTC's findings of horizontal and vertical agreements lack evidentiary support. TRU maintains that it acted unilaterally and in pursuit of its own economic self-interest, and it challenges the finding that it had sufficient market power to orchestrate a restraint of trade. The manufacturers also dispute the evidence that they participated in illegal agreements. Each manufacturer claims that it made unilateral decisions in lawful pursuit of its individual interest and not as a result of collusion with each other or with TRU. The manufacturers are prepared to offer testimony and documentary and expert evidence to support their specific contentions that no unlawful collaboration occurred, and to question the rationale of plaintiffs' theories and the persuasiveness of the inferences that plaintiffs would draw from circumstantial evidence. *See In re Medical X–Ray Film Antitrust Litig.*, 1998–2 Trade Cas. ¶ 72,305, 1998 WL 661515, at *4–*5 (E.D.N.Y. Aug. 7, 1998) (difficulty of proving conspiracy, as opposed to lawful competitive practices, and the consequent likelihood of a battle of experts evaluating circumstantial evidence, is a factor in approving adequacy of settlement); *Reebok*, 903 F.Supp. at 536 (difficulties of distinguishing between lawful unilateral conduct and unlawful coercion or conspiracy, and need to show effect on prices, supported approval of settlement).

In addition, there are considerable uncertainties in the proof of damages. Mattel and TRU point out numerous respects in which the conclusions of plaintiffs' experts could be challenged, including the assumption made by the experts as to the effect of unfettered competition on the availability and prices of toys at Warehouse Clubs, TRU, and other retailers, and the extent to which consumers would have become members of Warehouse Clubs or otherwise engaged in comparison-shopping. Each defendant also challenges the extent, if any, to which it may be held liable for the conduct of others. Mattel, for example, claims that, even if the evidence did support a finding that it had an understanding with TRU, the evidence would not support a finding that it unlawfully conspired with other manufacturers. Therefore, Mattel claims, it could be liable only for its own actions, not for the conduct of other manufacturers in concert with TRU or among themselves. *See Keds Corp.*, 1994 WL 97201, at *3 (settlement appropriate to avoid "hydra-headed litigation" where plaintiffs "would have to prove illicit agreements on a state-by-state and retailer-by-retailer basis," and there were also difficult questions of proving damages); *Medical X–Ray Film*, 1998 WL 661515, at *5 ("The complexities of proving and calculating damages 'increase geometrically' in class actions" (citation omitted)).

The Settlements, with their distributions of toys and educational programs, will benefit children nationwide. In addition, the toy consuming public will benefit from the injunctive relief and from the antitrust deterrent inherent in the successful and expeditious conclusion of this litigation. The decision to forego individual recoveries was sensible, given the difficulty of identifying proper claimants and the difficulty, and especially the costs, that such recoveries and their administration would have entailed. The net monetary relief for any individual claimant would have been limited. Under these circumstances, as the court stated in approving a similar settlement in *Reebok*, 903 F.Supp. at 537: "The distribution method here serves the general public interest, the interests of the plaintiffs and the consumers, and the public interests of disgorgement and deterrence. The distribution procedure included in the Settlement Agreement is thus fair, reasonable, and adequate." In affirming the district court, the Second Circuit in *Reebok* observed that the "impracticality of attempting to distrib-

ute the settlement proceeds among the multitude of unidentified possible claimants is obvious" and adopted the district court's statement, *id.* at 538, that such distribution "would be consumed in the costs of its own administration." 96 F.3d at 49. *Accord, Keds Corp.,* 1994 WL 97201, at *3 (approving charitable distribution of settlement proceeds in lieu of direct refunds to individual consumers where the damages per customer were small, it would be difficult if not impossible to trace the purchasers, and the costs of administration would "wipe out any economic benefit of the settlements"); *New York v. Dairylea Cooperative, Inc.,* 1985–2 Trade Cas. ¶ 66,675, 1985 WL 1825 (S.D.N.Y. June 26, 1985) (approving charitable distribution in affected area for nutrition-related purposes where difficulties and costs of administering refunds to milk customers made it unfeasible); *see* H. Newberg & A. Conte, Newberg on Class Actions § 10.17, at pp. 10–40 – 10–41 (3d ed.1992) (when recovery "cannot feasibly be distributed to individual class members … the court may direct that such undistributed funds be applied prospectively to the indirect benefit of the class.").

Had these cases proceeded, litigation would have been lengthy, highly complicated, and expensive. Given the costs of administering any damage awards to individual consumers, the already small potential individual recoveries likely would have been substantially reduced, even if plaintiffs had succeeded.

### Requirements of the Toy Distributions

Since the toy distributions are a central feature of the Settlements and substitute for direct refunds to consumers, I have, throughout these proceedings, been concerned with evaluating the fairness and reasonableness of both the written terms of the toy distributions as set forth in the Settlement Agreements and of the provisions for monitoring compliance with those terms. Actual experience, as described below, has confirmed that both are, and will prove in practice to be, fair and reasonable. Among other things, the toys distributed must be in good condition, include toys suitable for both boys and girls in a wide age range and be taken from current inventory. Prior to each distribution (the distributions will take place over two or three years) TRU must provide plaintiffs with a toy list identifying the quantity, mixture, diversity and Original Retail Price of each toy to be contributed that year well in advance of the distribution date. And plaintiffs have the right to veto toys which do not meet the Settlement criteria. The manufacturers also must provide plaintiffs with an advance list of toys to be distributed. Thus, the plaintiffs have undertaken to verify compliance, for example, by sending investigators to retail shops to ascertain that the toys to be included in a given distribution are varied, are from current inventory and meet the criteria for value set forth in the Settlement Agreements.

Monitoring of this type occurred prior to the successful Hasbro distribution, in December 1998, which was voluntarily undertaken prior to the Settlement Agreements' submission to the court for preliminary approval. In addition, Mattel, TRU, and Little Tikes determined to voluntarily distribute a portion of the agreed upon toys prior to approval of the Settlements, at the end of 1999. The plaintiff States promptly objected to many of the toys on Mattel's list. Mattel proceeded with its distribution while the parties continued their discussions, and they resolved their differences with a "Supplemental Mattel Toy Distribution Agreement." In that Agreement, Mattel, while it disputed that there was any defect in its initial distribution, agreed to supplement it by providing additional toys to children nationwide valued at almost four million dollars from a selection approved by the plaintiffs. The supplemental distribution was completed at the end of 1999.

The States chose the Marine Corps Toys for Tots Foundation as the organization to administer the distribution of the toys. Use of this organization, which will receive only $25,000 out of the class fund to assist in this task, a fraction of the actual cost, will save the plaintiffs enormous expenses in administering the distribution of the toys. The organization has long experience in distributing toys nationally to needy children. Each State can use one of two options, either using

Toys for Tots' existing distribution system within the State or identifying particular agencies or recipients and using Toys for Tots only to make deliveries. The court has been assured that Toys for Tots' sole criterion for determining eligibility is need and that no racial, religious or other discrimination will be involved in identifying recipients.

### Response of the Class

The response of the class to the proposed Settlements supports approval. Given the huge number of potential class members and the massive nationwide notice, which has been estimated to have reached tens of millions of toy consumers, it is significant that only fifty-five potential class members have chosen to exclude themselves from these actions and only a handful of consumers (four, formally, and approximately a dozen, informally) have raised objections. Although it is unclear whether each of the fifty-five "opt-outs" has fulfilled each requirement of the Notice provisions, I agree with class counsel and the States that all fifty-five should be treated as excluded. The defendants do not object to this conclusion.

The principal argument of the objectors is that class members should get personal refunds, but their objections do not respond to the practical problems, including the massive cost of administration for relatively small individual claims, which personal refunds to consumers would entail. For the reasons set forth above, these objections do not justify rejecting the settlement. *See Reebok*, 903 F.Supp. at 537–38.

█ The only objecting party who appeared, by counsel, at the Final Settlement Hearing was Joan Yarborough, of Public Citizen, who filed on behalf of herself as a toy consumer and on behalf of the organization. (Since she objected in both capacities, it is unnecessary to address plaintiffs' claim that Public Citizen itself, which did not purchase toys from TRU, has no standing to challenge the Settlements.) Ms. Yarborough, while not challenging the charitable distribution program, in lieu of direct refunds to purchasers, argues that, because of it, the only relief provided to the class members is the injunctive relief which she calls "ephemeral" and inadequate. To begin with, it is incorrect to

say, as she does, that the injunctive provisions add nothing to the existing requirement that the defendants obey the law. The provisions explicitly describe the type of unlawful agreements, that is, agreements by and between manufacturers and TRU to restrict the sales of toys to Warehouse Clubs in violation of antitrust laws, that are enjoined, and they subject the defendants to contempt citations if violated. Nor is it correct to say that the injunctive provisions add nothing to the FTC order. The injunctive provisions apply to the manufacturers, unlike the FTC order which is only against TRU. In addition, the injunctive provisions apply to TRU and the manufacturers for three years even if the FTC order is overturned on appeal. The provisions of the FTC cease and desist order against TRU are incorporated into the injunctive provisions against TRU in the Settlement Agreement, and the provisions of the FTC order that have not been stayed pending appeal are immediately enforceable against TRU in this court. To the extent that the FTC order is upheld on appeal, in whole or in part (including provisions that were stayed pending appeal), it will become or remain part of the injunction in this court and may be enforced in this forum in a contempt proceeding.

Ms. Yarborough also challenges the "Notice and Cure" provisions in the Settlement Agreements, which provide that, if plaintiffs determine that a defendant has violated the terms of the injunction, plaintiffs must give that defendant written notice, and the defendant has twenty business days to respond. If the response is unsatisfactory, plaintiffs must notify the defendant in writing, and the defendant has another twenty business days to cure the alleged violation. Plaintiffs may then seek enforcement in this court if the violation has not been cured. There is no dispute among the parties that these provisions do not affect the ability of anyone to seek relief, including damages, in a new action based upon new activity. Ms. Yarborough had suggested in her written submission that the Notice and Cure provision might impact upon the ability of consumers to bring new antitrust challenges; as the defendants agreed at the Settlement Hear-

ing, nothing in the provision would preclude a separate litigation arising from new antitrust violations. Moreover, it is reasonable to require that the parties briefly air and attempt to resolve a claim that a defendant is engaging in prohibited conduct before invoking the judicial process in an enforcement proceeding. An almost identical provision was included in the Final Judgment and Consent Decree approved in *Reebok*, 903 F.Supp. at 550.

Most importantly, Ms. Yarborough's objections are fundamentally flawed in two respects. First, in claiming that the method of distribution means that consumers will not benefit from the Settlements, she ignores the deterrent effect that inheres in the defendants' large payout of toys and cash. The Settlements, with their significant monetary cost to the defendants, must be evaluated not only in terms of their direct value to the public but also in terms of their deterrent effect on antitrust violators, an effect of value to consumers. Second, she ignores that a settlement is by its nature a compromise and that the issue, when the court reviews a settlement, is not whether the plaintiffs have achieved what they might have been able to achieve had they been successful on all issues at trial, but whether the compromise effected is fair, reasonable and adequate. As elicited at the Final Settlement Hearing, she makes no claim, and offers no factual or legal basis for the court to conclude, that the parties did not negotiate in good faith, at arms length and that counsel for the plaintiffs and the State Attorneys General did not obtain the best settlement available to them. Nor does she offer any ground for concluding that counsels' evaluations of the strengths and weaknesses of their case was in any way flawed. Finally, Ms. Yarborough's suggestion that the States "cannot be viewed as disinterested observers on the reasonableness of these Settlements" because they are requesting fees is utterly without basis. As discussed below, the States, like private counsel, have incurred expenses in pursuing these claims and will incur further expenses in monitoring the Settlements. The antitrust statute under which the States sue expressly recognizes that they should be compensated for successfully pursuing antitrust litigation.

The States have, in fact, performed admirably, efficiently and in the public interest, and the fees they request, as will be seen, are modest indeed.

### Costs, Expenses and Attorneys' Fees

■ Counsel for the class plaintiffs are entitled to recovery of reasonable attorneys' fees and expenses from the common fund. See *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The States are also entitled to recovery of their expenses and fees. 15 U.S.C. § 15c(a)(2) provides that "the court shall award the State ... the cost of suit, including a reasonable attorney's fee."

Counsel for both the class plaintiffs and the States have well-earned the compensation that they request. Although there have been a large number of lawyers, they have coordinated their efforts, and the court is satisfied that both the Attorneys General and the class plaintiffs have contributed to the relatively speedy resolution of these enormously complex cases. The Declaration of the mediator sets forth the efficiency with which both sets of counsel conducted themselves in settling these cases. Notably, the mediator singles out New York State Assistant Attorney General Linda J. Gargiulo for her able representation of the States, and I take this occasion to note my concurrence with the mediator's evaluation and add that her role in responding to the court's questions and concerns regarding the settlements, from the time of the initial request for preliminary approval, has been exemplary.

Counsel for the class, who include highly experienced class action antitrust lawyers, seek a total of $3,258,000, which represents 5.7% of the total Settlements of almost $57 million and 16% of the cash portion of the Settlements. Counsel for the class plaintiffs sued TRU over a year before the first complaint was filed by a State, and, as convincingly confirmed by the mediator, counsel for the class plaintiffs have played a significant role in both prosecuting and settling these actions. Thus, they, as well as the States, are entitled to recovery of reasonable fees and expenses. Whether evaluated under the conventional lodestar method, *see Grinnell*

*Corp.,* 495 F.2d at 468, 471, or as a percentage of recovery, *[see, e.g., Medical X-Ray Film,* 1998 WL 661515, at *6–*7; *cf. Savoie v. Merchants Bank,* 166 F.3d 456, 460–61 (2d Cir.1999) (declining to address viability of percentage-of-recovery method where facts did not support its application) ], the amounts requested are reasonable. (Indeed, by agreement with the Attorneys General, class counsel agreed to cap their fees at a figure below the lodestar.) Class counsel's request for reimbursement of costs and expenses of $458,784.60, principally for expert witnesses and mediation, also is reasonable and allowable. As mentioned earlier, the very modest sum of $25,000 is sought for Toys for Tots, which is a fraction of the actual cost of toy distribution, to be paid from the proceeds of the Settlement with certain manufacturers that are defendants only in the class action. This request also is proper.

■ The Settlement Agreements provide a total of $2,176,000 in compensation to the States. $310,000 is allocated to the National Association of Attorneys' General (NAAG) Milk Fund, which funds the costs of expert witnesses in multistate antitrust investigations and litigation, and $25,000 is allocated to the NAAG Litigation and Training Fund for training of state antitrust lawyers. The Settlement Agreements authorize each State to use its share of the remaining $1,841,000 for one or more of the following purposes: (a) reimbursement of attorneys' fees incurred; (b) antitrust or consumer protection enforcement by the attorney general; (c) deposit in a state antitrust or consumer protection account for use in accordance with state law; or (d) deposit into a fund to assist the State to defray the cost of multistate antitrust investigations and litigations. The fees sought by the States, which amount to 3.82% of the total value of the Settlements and 11.05% of the $19,696,500 aggregate cash value of the Settlements with defendants in the action brought by the States, are justified by the States' efforts and are reasonable. The Settlement Agreement with Hasbro allows the States to apply to the court for up to $100,000 more from the Hasbro Settlement Fund for certain additional costs. The States have requested $86,912.35 for costs expended, including the cost of their expert

economist. The amounts sought are reasonable.

In sum, the combined compensation to the States and class plaintiffs' counsel will be $5,434,000, which is 9.54% of the total value of all Settlements and 26.69% of their cash value. This amount is reasonable.

### CONCLUSION

The Settlements are approved. Judgments incorporating the Settlements and Orders regarding fees and expenses will be entered.

**SO ORDERED.**