State of NEW YORK, et al., Plaintiffs,

v.

SALTON, INC., Defendant.

No. 02 Civ. 7096(LTS)(AJP).

United States District Court,
S.D. New York.

May 30, 2003.

Jay L. Himes, State of New York Office of Attorney General, New York City, for Plaintiffs.

Stephen A. Marshall, Howard H. Weller, Sonnenschein, Nath & Rosenthal, New York City, for Defendant.

## MEMORANDUM ORDER

SWAIN, District Judge.

This action arises out of alleged violations by Defendant Salton, Inc. ("Salton") of various federal and state antitrust laws, including section 3 of the Clayton Act, 15 U.S.C.A. § 14 (West 1997), in connection with Salton's distribution of George Foreman Grills (the "Grills") to retailers. Plaintiff States brought this action on their own behalf and as *parens patriae* on behalf of their natural-person residents under Section 4C(c) of the Clayton Act, 15 U.S.C.A. § 15c(a)(1) (West 1997). The parties entered into a Settlement Agreement prior to the September 6, 2002 filing of the original complaint. On January 13, 2003, the Court issued an order preliminarily approving the Settlement Agreement. Plaintiffs now move for final approval. The Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1367.

The Court has considered thoroughly all argument and submissions in connection with the instant motion. For the following reasons, Plaintiffs' motion is granted.

Plaintiffs contend that Salton 1) entered into price-fixing agreements with retailers, and suspended the supply of certain Grills to retailers who charged prices below the minimum set by Salton for those Grills, and 2) conditioned its sale of certain Grills on retailers' refusal to stock non-Salton contact grills. Plaintiffs allege that this conduct caused the prices of certain Grills to be maintained at artificial, non-competitive levels. In support of the instant motion, Plaintiffs have submitted the affidavit of Dr. Frank Lichtenberg, an expert economist. Dr. Lichtenberg estimates the overcharges paid by purchasers during the period from January 1998 to September 2002 to total approximately $33 million. (Lichtenberg Aff. ¶ 28.)

The Settlement Agreement requires Salton to make a structured payment of $8 million, less that portion attributable to non-participating States. The payments, and Plaintiffs' releases required to be delivered under the Settlement Agreement, are to be placed in escrow until Salton makes all the scheduled payments, the last of which is to be made by March 1, 2004. The settlement fund is then to be allocated *pro rata* among Plaintiffs, and to be distributed *cy pres* to non-profit or governmental entities. Each State is to prepare a plan of distribution, requiring approval of the Court, by March 10, 2004.

Under the Settlement Agreement, Salton also agreed to pay the entire cost of providing consumers notice of the settlement, and an additional $200,000 to cover Plaintiffs' attorneys' fees and costs.

The Settlement Agreement provides for injunctive relief as well. Under its terms, Salton has agreed to the entry of a Final Judgment and Consent Decree enjoining Salton from committing the practices described in the Complaint for five years, with certain exceptions, and including various other requirements, such as requiring Salton to grant Plaintiffs reasonable access to documents related to the Judgment or Settlement Agreement and to hold mandatory antitrust law training for its sales staff.

In support of the instant motion, Plaintiff has also submitted the affidavit of Wayne L. Pines, the Executive Vice President of the consulting firm retained to effect the publication of the Notice of Settlement, in accordance with the Court's January 14th Order. On the basis of Mr. Pines' uncontroverted affidavit, the Court

finds that the notice provisions of the January 13th Order have been satisfied.

■ The Clayton Act requires court approval of any *parens patriae* settlement agreement. *See* 15 U.S.C.A. § 15c(c) (West 1997). Although section 15c(c) does not specify the legal standard for approval, courts look generally to the standard applied in approving class action settlements under Federal Rule of Civil Procedure 23(e). *See State of New York v. Keds Corporation,* No. 93 Civ. 6708, 1994 WL 97201, *2 (S.D.N.Y. March 21, 1994). A settlement will be approved if it is fair, reasonable, and adequate. *Id.*

■ The fairness of a settlement concerns whether it resulted from "good faith, arms-length bargaining between experienced counsel." *State of New York v. Nintendo of America, Inc.,* 775 F.Supp. 676, 680 (S.D.N.Y.1991).

■ Plaintiffs here represent that the Settlement Agreement was executed only after approximately seven months of adversarial negotiation, which was preceded by a two-year investigation by Plaintiff States into Salton's alleged illegal conduct. Counsel for Plaintiffs include the Offices of the Attorneys General for all but three States; those Offices have extensive experience in bringing complex antitrust cases under their *parens patriae* powers. *See Nintendo,* 775 F.Supp. at 680 (recognizing experience of Attorneys General). Counsel for Salton, Sonnenschein, Nath & Rosenthal, also has experience in antitrust litigation. Indeed, principal counsel for Salton, Alan H. Silberman, is a former Chair of the Antitrust Section of the American Bar Association, with 35 years of antitrust experience. The Court therefore finds that the Settlement Agreement is fair. *Cf. Keds,* 1994 WL 97201, at *2 (finding settlements fair where negotia-

tions between experienced counsel "were intense and extended over five months").

■ To determine whether a settlement is reasonable and adequate, a court must weigh the compensation offered to the plaintiffs against the following factors:

(1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement.

*Id.*

Although no grounds for doubting the solvency of Salton have been raised, all of the other factors as present in this case weigh in favor of approval. Litigation of this matter would be lengthy and complex, requiring extensive discovery of nationwide scope, as other courts have recognized in similar cases. *See State of New York v. Reebok International Ltd.,* 903 F.Supp. 532, 536 (S.D.N.Y.1995) ("case ... would drag on for years as the parties conducted discovery throughout the country"); *Keds,* 1994 WL 97201, at *3 ("hydra-headed litigation would be complex and costly").

Salton vigorously denies Plaintiffs' merits allegations, asserting that its pricing and dealing policies constituted unilateral, and thus lawful, conduct, under the Supreme Court's decisions in *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and *Monsanto Co. v. Spray–Rite Serv. Corporation,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Under *Monsanto,* Plaintiffs would be required to present "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common

scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768, 104 S.Ct. 1464. Plaintiffs would have to prove the existence of "illicit agreements on a state-by-state and retailer-by-retailer basis," *Keds*, 1994 WL 97201, at *3, a difficult burden to meet.

Even if Plaintiffs could prove the existence of unlawful agreements between Salton and its retailers, they would still have to prove that consumers were overcharged as a result of the scheme. Plaintiffs' own expert indicated the difficulty of such a task, because data on the wholesale and retail prices during the period prior to the implementation of Salton's pricing policy at issue are unavailable. *See* Lichtenberg Aff. ¶¶ 13–14. Salton would be entitled to offer evidence of alternative reasons for the relevant retail prices, reasons that, in the opinion of Salton's expert economist, render highly unlikely any attempt to establish that retail prices would have dropped in the absence of Salton's pricing policy. *See* Declaration of Dr. Sumanth Addanki ("Addanki Decl."), attached to Def.'s Mem. in Support of Prelim. Approval.

The lack of opposition to the settlement also weighs in favor of its approval. Only 12 class members, out of a potential class of millions, opted out of the Settlement, and only 6 filed formal objections. *See* Exs. D, E to Weinstein Decl. Those objections related to the *cy pres* method of distribution, with the exception of an objection to the action itself, and they do not lead the Court to conclude that the Settlement is not fair, reasonable, and adequate. *See Reebok Int'l Ltd.*, 903 F.Supp. at 537 (characterizing as "miniscule" opposition to settlement consisting of 209 class members informally objecting and 13 formally objecting, and finding that objections did not constitute grounds to deny approval).

Because of the difficulty in identifying and locating individual purchasers of the Grills, and the minimal amount of recovery an individual consumer would be entitled to compared to the cost of administering individual relief, the Court finds that the *cy pres* method of distribution proposed in the Settlement Agreement is reasonable and adequate. *Cf. Keds*, 1994 WL 97201, at *3 (approving *cy pres* distribution where damages per consumer were small and consumers difficult to locate); *Reebok Int'l Ltd.*, 903 F.Supp. at 537 (same).

The Settlement Agreement also provides for payment by Salton for attorneys' fees and costs in the amount of $200,000, less than 3% of the settlement fund, to cover the costs of the investigation and settlement negotiation. Courts have approved fee awards constituting higher percentages of the settlement fund. *See, for example, Reebok Int'l, Ltd.*, 903 F.Supp. at 534 (approving settlement where fees and costs equaled $1.5 million and distribution amount was $8 million); *In re Toys "R" Us Antitrust Litigation*, 191 F.R.D. 347, 357 (E.D.N.Y.2000) (approving fee award to counsel totaling 9.54% of total settlement value, and 26.69% of cash portion of settlement). Furthermore, the Court has considered carefully the evidence submitted concerning the legal time expended, and expenses incurred, in the prosecution of this action, as well as the market hourly rates for comparably experienced counsel. The Court finds that the attorneys' fees and costs provided for under the Settlement Agreement are reasonable.

In light of the above factors, when balanced against the amount of the settlement fund, the Court finds that the Settlement Agreement is reasonable and adequate.

### Conclusion

For the foregoing reasons, Plaintiffs' motions is granted, and the Settlement

Agreement is approved. The Final Judgment and Consent Decree will be entered by separate order.

SO ORDERED.

## FINAL JUDGMENT AND CONSENT DECREE

The States of New York, Illinois, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and Wyoming, the Commonwealths of Kentucky, Massachusetts, Pennsylvania, Puerto Rico and Virginia, and the District of Columbia ("Plaintiff States") have filed a Complaint for damages and injunctive relief on their own behalf and as *parens patriae* on behalf of natural persons residing in the Plaintiff States who purchased Salton's George Foreman Contact Grills, as defined in the Complaint, during the period of the alleged violation, against the Defendant Salton, alleging violations of federal and state antitrust laws. Salton denies the Plaintiff States' allegations.

The Parties desire to resolve any and all disputes arising from the matters alleged in the Complaint, and have entered into a Settlement Agreement which has been filed with the Court and is incorporated by reference. In full and final settlement of the claims set forth in the Complaint, Salton has agreed to pay compensatory damages, administration costs and costs and fees incurred by Plaintiff States, as set forth in the Settlement Agreement executed on September 5, 2002 (the "Settlement Agreement"). Salton has also agreed to entry of this Final Judgment and Consent Decree. Plaintiff States have agreed to execute Releases of their claims against Salton, *as parens patriae*, and to release the claims of natural persons residing in the States who have not filed Requests for Exclusion, in accordance with the terms of the Settlement Agreement, and as allowed by State law.

Notice of the Settlement was given pursuant to Court order in accordance with 15 U.S.C. § 15c and the requirements of due process. The Notice was the best notice practicable under the circumstances. An opportunity to be heard was given to all persons requesting to be heard in accordance with this Court's orders. The Court reviewed the terms of the Settlement, the submissions of the Parties in support of it, and the comments received in response to the notice. After a hearing held on May 30, 2003, the Court approved the Settlement Agreement on May 30, 2003, and determined it to be in all respects fair, reasonable and adequate. That Order was entered on May 30, 2003.

NOW, THEREFORE, without trial or adjudication of any issue of law or fact, before the taking of any testimony at trial, without the admission of liability or wrongdoing by Salton and upon the consent of the Parties,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

## I

### JURISDICTION

The Court has jurisdiction over the subject matter of this action and the Parties. The Complaint raises claims against Salton under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Sections 3, 4c, and 16 of the Clayton Act (15 U.S.C. §§ 14, 15c and 26). Jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331 and

1337. The Complaint also raises supplemental state law claims.

## II

### DEFINITIONS

As used in this Final Judgment and Consent Decree:

A.  "Agreement" means any agreement, combination, or contract between Salton and another party, and any understanding, promise or condition to which assent has been sought by Salton. Agreement embraces all of the foregoing, whether written or oral, express or implied.

B.  "Contact Grill" means any two-sided electric grilling appliance sold for indoor use.

C.  "Deal" means to sell, offer to sell, contract to sell, advertise or promote.

D.  "Dealer" means any Person not owned by Salton that Deals Salton Indoor Grills.

E.  "Indoor Grill" means any electric grilling appliance sold for indoor use.

F.  "Non–Salton Grill" means any Indoor Grill not manufactured by or for Salton.

G.  "Parties" means Salton and the Plaintiff States.

H.  "Resale Price" means any price, price floor, price range or any markup formula or margin of profit used by any Dealer for pricing Salton Grills, or used by any person to sell any Salton Grill to any Dealer.

I.  "Represent" means to assure, express, imply, represent or engage in an act intended to communicate assurance, under circumstances where such communication or act has been sought by Salton as an indication or sign of assent.

J.  "Salton" means Salton, Inc. and all of its successors, assigns, parents, subsidiaries, divisions, officers, directors, employees, agents, representatives, related or affiliated entities, and any other person acting on its behalf.

K.  "Salton Contact Grill" means any Contact Grill manufactured, sold or offered for sale by Salton in the United States, and/or the U.S. territories or possessions.

L.  "Salton Grill" means any Indoor Grill manufactured, sold or offered for sale by Salton in the United States, and/or the U.S. territories or possessions.

M.  "Settlement Agreement" means the agreement entered into by Salton and the Plaintiff States on September 5, 2002.

## III

### APPLICABILITY AND TERM

This Final Judgment and Consent Decree shall apply to the Parties and unless otherwise stated, shall be in effect for 5 years.

## IV

### INJUNCTION AGAINST PROHIBITED CONDUCT

Salton is enjoined as follows:

A.  For 3 years Salton shall not enter into or enforce any Agreement in which any Dealer Represents that it has not Dealt, or does or will not Deal, any non-Salton Indoor Grill, or is prevented or restrained from Dealing any Non–Salton Indoor Grill.

B.  Salton shall advise all Indoor Grill Dealers, in writing, during each of the 2002, 2003, and 2004 calendar years, that sales of Salton Grills are not made on any Agreement that the Dealer may or will not Deal other competitive products.

C.  For two years following the completion of the period in IV.A, Salton shall

not enter into or enforce any Agreement that would otherwise violate paragraph IV.A, above, unless and *only* if (a) the Agreement is in writing and signed by all parties to it, and (b) no less than fifteen (15) days prior to entering into any such Agreement, Salton provides notice of its intent to seek such an Agreement, and a copy of the proposed Agreement, to the Attorneys General of the State of New York and the State of Illinois, acting on behalf of the other Plaintiff States. Nothing in this provision shall preclude any State Attorney General from challenging any such Agreement as unlawful, independent of the terms of this Decree.

D. Salton shall not enter into or enforce any Agreement with any Dealer to fix, raise, peg, or stabilize the Resale Prices at which Salton Grills are Dealt to consumers. Salton shall not coerce any Dealer to enter into any such Agreement, by any communication or action to reduce, restrict or suspend supplies of Salton Indoor Grills.

E. Salton shall not secure, or attempt to secure, any Representation from any Dealer, concerning the Resale Price at which the Dealer may Deal Salton Grills. Salton shall not coerce or attempt to coerce any Dealer to provide any such Representation by any communication or action to reduce, restrict or suspend supplies of Salton Indoor Grills.

F. Salton shall not condition any sale, term of sale, allocation, or priority for allocation of any Salton Grill on any Agreement, Representation or act by a Dealer indicating that the Dealer has not, does not or will not, Deal Indoor Grills at prices below any Resale Price designated, stated or suggested by Salton.

G. Salton shall not refuse to Deal Salton Grills to any Dealer under circumstances in which Salton communicates that:

1. Salton's action:

(a) is subject to reconsideration after a specified or limited period of time has elapsed; or

(b) is otherwise limited in time;

2. the Dealer with respect to whom Salton has acted may submit purchase orders to Salton after a specified or limited period of time has elapsed; or

3. Salton will automatically decline to sell to that Dealer in the future if the Dealer Deals at prices below the Resale Price designated, stated or suggested by Salton.

H. Salton shall not state or suggest to any Dealer, that it will or did not do business in Indoor Grills with that or any other Dealer, or ceased to do business in Indoor Grills with that or any other Dealer, by reason, in whole or in part, of that or another Dealer's failure to Deal at or above a price designated, stated or suggested by Salton.

I. Salton shall not state or suggest to any Dealer, that it will or did not do business with that or any other Dealer, or ceased to do business with that or any other Dealer, by reason, in whole or in part, of that or another Dealer's failure to Deal at or above a price designated, stated or suggested by Salton for Indoor Grills.

J. Salton shall not coerce or attempt to coerce any Dealer to make any Agreement or Representation, or to do any act prohibited by this Decree, by communication or action to terminate, or otherwise adversely affect, a Dealer's orders of Salton Grills.

K. Salton shall not advertise or promote Salton Grills, referencing a retail price as a point of comparison for grills sold directly by Salton, at an amount higher than the retail prices at which

such grills are in fact sold at most Salton Dealers.

# V

## OTHER OBLIGATIONS

A. For five years, Salton shall keep detailed written records, on a monthly basis, in a form approved by the Plaintiff States, as to the inventory-on-hand for each Salton Grill model being offered for sale, the amount shipped during the period, the amount of any forecast or advanced commitment (if available), the amount actually ordered by each customer, the amount allocated to each customer, and the amount which Salton has on order for future production. All letters, memoranda or other communications and records relating to any allocation of Salton Grills (other than identical copies) shall be retained and a file of all such documents shall be maintained by Salton's chief legal officer to and including December 31, 2009.

B. All Salton sales personnel including its Chairman of the Board and its President shall attend a sales/marketing legal review presentation, conducted for at least one-half day and held at least one time in each of the periods September 6, 2002—September 5, 2003 and September 6, 2003—September 5, 2004. Such legal review shall not be conducted by the company's internal legal counsel or any outside counsel regularly consulted by the company, but shall be conducted by an antitrust specialist who has been (or is) engaged in antitrust enforcement and/or teaching of antitrust law. Any written materials used in such a presentation shall be provided to the State Attorneys General of New York and Illinois, on behalf of the Plaintiff States, as well as to all Salton sales personnel who join Salton in the year following the presentation.

C. The Attorneys General of the States of New York and Illinois may provide any information they receive pursuant to this Decree to any other law enforcement agency, including but not limited to any other State Attorney General.

# VI

## ADDITIONAL PROVISIONS

A. This Decree shall not be construed to preclude Salton from:

1. selecting the Dealers or prospective Dealers with which it will Deal or continue to Deal in accordance with applicable law and as otherwise consistent with this Decree.

2. considering a Dealer's sales volume, sales effort, forecasting, ordering practices or marketing practices in deciding:

(a) whether to do business with that Dealer; or

(b) the amount of product to be allocated to that Dealer.

3. allocating the amount of product sold to, or refusing to Deal with, any person based on Salton's good faith determination that that person has followed a practice of submitting forecasts or advanced commitments that are inflated when compared to purchase orders actually tendered.

4. allocating the amount of the product sold to Dealers based on bona fide business reasons. "Bona fide business reasons" shall not include:

(a) the Resale Price at which the Dealer Deals or has Dealt Salton Grills;

(b) the Dealer's refusal to refrain from Dealing non-Salton Grills; or

(c) the Dealer's failure to make any Agreement or Representation, or to do any act, prohibited by this Decree.

5. announcing or suggesting Resale Prices and explaining the business rationale for such recommendation.

6. entering into an Agreement with any Dealer relating to the maximum resale price at which Salton's products may be sold, to the extent authorized by law.

7. refusing to Deal Salton Grills to a Dealer under circumstances in which:

(a) Salton has come to a good faith conclusion, based on information reviewed by its counsel, that the Dealer, or a supplier selling to the Dealer, (i) is misleading the consumer in violation of law by providing or creating false or misleading information concerning Salton Grills or unfair and incorrect product comparisons between Salton Grills and Non–Salton Grills; or (ii) that the Dealer is engaging in "bait and switch" techniques in violation of law in which potential customers seeking Salton Grills are induced to come to the Dealer's place of business when the Dealer knows that the desired product is not on hand in sufficient quantity and the Dealer diverts the customer to a different product;

(b) Salton has given the Dealer written notice of its conclusions; the facts and circumstances on which those conclusions are based; the specific legal provision(s) which has been violated; the steps to be taken to achieve compliance with the violated provision; and a period of no less than 30 days to achieve reasonable compliance with the allegedly violated legal provisions;

(c) Salton has provided a copy of the notice sent to the Dealer to the Offices of the New York and Illinois Attorneys General, acting on behalf of the other Plaintiff States, by overnight delivery as of the date the notice is sent; and

(d) upon request, Salton has provided the New York and Illinois Attorneys General, acting on behalf of the other Plaintiff States, with all written communications between Salton and its counsel, made prior to the sending of written notice to the Dealer, regarding the subject of that notice, including the "information reviewed by counsel" described in (1); and

(e) the Dealer has failed, after expiration of the compliance period specified in the notice, to cure the legal violation and to provide reasonable assurance of future compliance with the violated provision; provided however, that Salton shall not then refuse to Deal with the Dealer if either (i) the Dealer has instituted an action against Salton with respect to this decision and a Court has afforded the Dealer temporary, preliminary or permanent relief (subject to the provisions of any such Order) or (ii) any state or federal law enforcement or regulatory authority has instituted a judicial or administrative proceeding alleging that Salton's decision with respect to the Dealer is contrary to law or in violation of this Decree.

8. instituting legal action with respect to a Dealer's violation of Salton's patent, copyright, trademark, trade dress or other intellectual property rights, and securing such preliminary or permanent equitable relief as a Court may allow; provided, however, that Salton shall provide a copy of any such complaint to the Offices of the New York and Illinois Attorneys General at the time such action is filed.

9. providing any Dealer with a copy of this Decree.

B. Nothing in this Decree shall authorize Salton to do any act, or to enter into or enforce any Agreement, in violation of any law.

C. Nothing in this Decree shall be construed to provide that any conduct prohibited by it will or would be permissible under any state or federal law upon the expiration of the term of this Decree.

## VII

### COMPLIANCE

For purposes of determining and securing compliance with this Final Judgment and Consent Decree, duly authorized representatives of the Plaintiff States shall be permitted upon 15 days prior written notice:

A. Reasonable access during normal office hours to any and all relevant and non-privileged records and documents in the possession, custody, or control of Salton which relate to any of the matters contained herein or in the Settlement Agreement.

B. to conduct interviews, subject to the reasonable convenience of Salton, of any of the directors, officers, employees, agents, and any other persons acting on their behalf, each of whom may have counsel present, relating to any non-privileged matter contained herein or in the Settlement Agreement.

C. Salton retains the right to object to any request under paragraphs (a) or (b) above within 10 days after its receipt on the grounds that the request is not reasonable, or not relevant to the matters contained herein or in the Settlement Agreement, or otherwise is not in accordance with law. Any such objection shall be directed to this Court for a ruling, with service by mail of the objec-

tion upon the States of New York and Illinois.

D. If the Attorney General of any Plaintiff State determines that Salton has violated the terms of this Final Judgment and Consent Decree, he shall give Salton written notice of the violation, and Salton shall have 20 days to respond in writing. If the State is not satisfied with Salton's response, it shall notify Salton in writing, and Salton shall have 20 days to cure such non-compliance. If after such time Salton has not cured the violation to the State's satisfaction, the State may apply to the Court for relief, including a finding of contempt.

## VIII

### JURISDICTION RETAINED

Without affecting the finality of this Final Judgment, jurisdiction shall be retained by this Court for the purpose of enabling any party to apply for such further orders and directions as may be necessary or appropriate for the construction or enforcement of this Final Judgment and Consent Decree or Settlement Agreement, the ruling upon any objection made pursuant to Section VII, the modification of any provision of this Judgment to the extent such modification is permitted, and the remedy of a violation of any provision contained herein. This Court shall have the authority to specifically enforce the provisions of this Final Judgment and Consent Decree.

## IX

### INJUNCTION AGAINST PROSECUTION OF CLAIMS

The Plaintiff States, and all natural persons residing in those States, who pur-

chased Salton Contact Grills during the period January 1, 1998 to September 6, 2002 (except persons who have filed Requests for Exclusion) are barred and enjoined from commencing or otherwise prosecuting against Salton (as defined above) and its former directors, officers, employees, agents, representatives and other persons formerly acting on their behalf, any Released Claims, as that term is defined in the Settlement Agreement.

## X

### *TERMINATION OF DECREE*

Unless otherwise ordered for good causes shown, on the fifth anniversary date of this Final Judgment and Consent Decree, this Final Judgment and Consent Decree shall automatically terminate without any action by either party or the Court.